Argued and submitted August 17, reversed and remanded September 30, 2020

In the Matter of J. A. M. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. A. K.,
*Appellant.*

Josephine County Circuit Court
18JU02550; A173487

474 P3d 925

Father appeals from a juvenile court judgment changing his son's permanency plan from reunification to guardianship. Father argues that the Department of Human Services (DHS) did not demonstrate that it had made "reasonable efforts," pursuant to ORS 419B.476(2)(a), to achieve reunification prior to moving for a change in the child's permanency plan. Specifically, father argues that the sole basis for jurisdiction alleged and found proven by the juvenile court was "amorphous and ill-defined." That sole basis was that, "[D]espite prior services offered to the father [by DHS and] other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child." DHS responds that "impediments," as that term is used in this case is a euphemism for father's addiction and criminal activity. Thus, DHS's efforts in referring father to drug and alcohol services, as well as planning for in-home treatment, made their efforts reasonable. *Held*: The term "impediments" is vague and amorphous, and given the context here, cannot be a euphemism for father's "addiction and criminal activity." Accordingly, DHS did not meet its burden to establish that it provided father services sufficiently related to the jurisdictional basis so as to constitute "reasonable efforts."

Reversed and remanded.

Matthew G. Galli, Judge.

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Kirsten M. Naito, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

Father appeals from a juvenile court judgment changing his son's permanency plan from reunification to guardianship, asserting four assignments of error. In his first assignment of error, father argues that the juvenile court erred in its determination that the Department of Human Services (DHS) satisfied its burden to prove that it made reasonable efforts to assist father in ameliorating the jurisdictional basis pertaining to father's relationship with child, which was, "[D]espite prior services offered to the father [by DHS and] other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child." We agree, and accordingly reverse and remand.

Neither party has requested *de novo* review, and this is not the type of "exceptional" case that warrants *de novo* review. As we have explained, on appeal of a permanency judgment, "[t]he juvenile court's determination[] whether DHS's efforts were reasonable *** [is a] legal conclusion[] that we review for errors of law." *Dept. of Human Services v. G. N.,* 263 Or App 287, 294, 328 P3d 728, *rev den,* 356 Or 638 (2014). In conducting that review, we are bound by the juvenile court's explicit factual findings if there is any evidence to support those findings. *Id.* To the extent that a court does not make its findings express, we presume that the court made implicit factual findings in a manner consistent with its ultimate legal conclusion. *Id.* However, "[i]f an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply." *Pereida-Alba v. Coursey,* 356 Or 654, 671, 342 P3d 70 (2015). The threshold issue here, whether the department made reasonable efforts to assist father in alleviating the jurisdictional basis, is a highly fact-specific inquiry warranting a detailed recitation of the facts below. *Dept. of Human Services v. J. E. R.,* 293 Or App 387, 394, 429 P3d 420 (2018).

This case concerns father's child, J, who was almost five years old at the time of the permanency hearing at issue in this appeal. J suffered prenatal exposure to methamphetamine and was born drug affected in January 2015.

Father had a history of using methamphetamine and heroin and was convicted for multiple crimes related to possession, manufacture, and delivery of those substances beginning in 2006. In March 2015, three months after J's birth, father pleaded guilty to unlawful possession and delivery of methamphetamine and felon in possession of a firearm and entered the drug court program. In September 2015, the department removed J from mother's care, filed a dependency petition, and placed him with father, who was participating in drug court. Six months later, in March 2016, the court dismissed the department's petition. Father successfully completed drug court in late 2016 and earned a dismissal of the delivery charge. Father began using marijuana shortly thereafter and eventually began using heroin and methamphetamine again. By early 2017, father admitted that he was using "every day."

J remained in father's care until 2018. In January 2018, DHS received reports that J was wandering alone on the street. At that time, DHS also received information that father was delivering methamphetamine and heroin from his home. DHS also learned that father was in a relationship with a woman who used controlled substances. DHS made several in-home visits, referred father to a self-sufficiency case manager, and referred father for periodic urinalysis tests.

In March 2018, police arrested father for unlawful possession and delivery of methamphetamine and heroin, and he spent several days in jail. Father admitted to using controlled substances for more than a year. Subsequently, the department placed J with a worker from the daycare he attended. Upon father's release from jail, DHS held an emergency meeting with father, his family, friends, and agency partners. Together they developed an emergency plan so that J could be returned to father. Father expressed a desire to resume substance abuse treatment, and he enrolled himself for treatment with the same provider who treated him while he was in the drug court program. Although DHS returned J to father's care with an "intensive plan" in place, DHS also filed a petition alleging nine jurisdictional bases, which were annotated "a" through "i." "[A]" through "d" pertained

to J's relationship with mother, which is not the subject of this appeal. The alleged jurisdictional bases pertaining to father were as follows:

"e)   Further, the father's substance abuse interferes with his ability to safely parent the child.

"f)   Further, despite prior services offered to the father through DHS and other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child.

"g)   Further, the father leaves the child with unsafe caregivers.

"h)   Further, the father is involved in criminal activities that interfere with his ability to safely parent the child.

"i)   Further, the child has specialized needs that father is unable or unwilling to meet without the assistance of a public, child caring agency."

"[G]" and "i" were dismissed by the juvenile court. The court did not annotate any disposition of "e" or "h." The jurisdictional judgment only found that basis "f" had been proved. Accordingly, the sole jurisdictional basis found by the juvenile court was, "[D]espite prior services offered to the father through DHS and other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child."

Father did not begin substance abuse treatment as he had agreed, and "family members, that originally imparted a willingness to help, and [was] expected to help for the first 5 nights did not show up" as expected. Specifically, father failed to obtain an assessment and forged attendance verification for four recovery meetings. Within a week, in late March 2018, DHS removed J from father's care and placed him in foster care.

In late May, the department returned J to father's care for a trial reunification because father and his partner were both attending substance abuse treatment and received positive reports from their providers. DHS continued in-home visits with father and J five days per week and reported that father was patient with J, despite J's challenging behaviors.

Outside the home, however, father served as a confidential police informant. Despite father's successes at home with J, it became difficult for father to balance their relationship, recovering from substance abuse and addiction, and life outside the home as a confidential informant. A month later, in July 2018, police executed a search warrant on father's home and found methamphetamine, heroin, scales, and "other paraphernalia" throughout the home and, specifically, in J's closet. Police arrested father, and DHS placed J in foster care.

DHS referred J for a mental health evaluation, during which he was diagnosed with global development delay, post-traumatic stress disorder (PTSD), and it was "highly suspected" that J suffered from child neglect. The evaluation also noted that J has "significant issues with anger and aggression" and has at least 12 tantrums each day. J has "significant sleep issues" and has "enuresis episodes nearly every night." J also has a "general cognitive ability in the Low range," "weakness" in verbal reasoning and comprehension, "significant delays" in nonverbal reasoning, and difficulty with attention, focus, and impulsivity. Finally, the evaluation stated that J requires "significant mental health support with caregiver involvement," and not having a permanent home and caregiver "are highly likely to present a barrier to him getting the full effects of treatment." In the evaluator's opinion, J has "an extremely high need for permanency."

A couple of days after father's arrest, father expressed remorse and acknowledged to DHS that he had "relaps[ed] on meth." In July 2018, father pleaded guilty to unlawful possession of heroin and unlawful delivery of methamphetamine, and the court sentenced him to 25 months of incarceration.

By all accounts, father did exceedingly well in prison, completing a variety of treatment programs "on his own will." In April 2019, father enrolled into the Alternative Incarceration Program, which required participation in 14 hours of structured activities a day, including substance abuse treatment, parenting classes, and anger management classes. He also held a job in the kitchen as one of three

cooks, played guitar for weekly religious services held in the prison, and served as part of the council for his therapeutic community in prison and a mentor to some of his peers. According to father, he used his time in prison "to help [himself] grow and just get as much out of it as [he] could[.]"

While father was incarcerated, J was placed in foster care. Several foster care providers were unable to manage J's violent outbursts and difficult behaviors, and he was transferred between foster care providers several times. Although father went to prison in July 2018, the department did not facilitate any contact between father and J for several months. Starting in late 2018, DHS facilitated weekly visits between father and J via Skype.

The department's "courtesy caseworker" met with father at the prison every month, but the worker never discussed with him any measures that father could perform that would be helpful beyond the programs in which he was already engaged, nor did the worker communicate any of J's changing needs. DHS sent father four nearly identical letters of expectation during his incarceration, stating, "The barriers to your child being returned to you are (incarceration, substance abuse, criminal conduct, lack of parenting skills that impact your ability to make the necessary changes in behaviors and conduct)." Three of the four letters ordered father to complete all seven of the following tasks to overcome those barriers:

"1)   Substance abuse assessment and recommended treatment

"2)   Urinalysis or other drug and alcohol testing

"3)   Parenting program

"4)   In-home Safety and Reunification Services

"5)   Abide by requirements of probation/post-prison supervision

"6)   No criminal activities

"7)   Psychological Evaluation and Recommended Services."[1]

---

[1] The first of the four letters did not contain the seventh task that father was required to complete. The subsequent letters, however, did contain that task.

In April 2019, while father was incarcerated, DHS referred father to psychologist Jeff Clausel for an evaluation. DHS did not provide father with the results of that evaluation until he had been released from prison and a post-release evaluation was unable to be completed until two weeks prior to father's permanency hearing. During the permanency hearing, Clausel testified extensively regarding the results of the psychological evaluation and his recommended treatments for father, noting that, while incarcerated, father participated in the maximum amount of therapy and programs available to him, but explaining that he doubted father's ability to provide a safe environment for his child within a reasonable amount of time, given the nature of father's history of substance abuse and his personality disorder.

Upon release from prison in October 2019, father, on his own volition, moved into transitional housing. He also chose to engage in outpatient substance abuse treatment. That treatment assists previous offenders to recognize and respond appropriately to moral dilemmas, and it also requires participants to cooperate with "surprise" urinalyses, attend 12-step meetings, begin working with a parent-mentor, enroll in a program to become a peer-mentor with the drug court program, and attend church regularly. He also got a full-time job with an employer who understood that father was "trying to get [his] life back together" and was willing to accommodate father's need for flexibility to attend court hearings and do things related to his recovery. Father's partner (by then, fiancée) had graduated from the "Mom's Program," was living in transitional housing, and had been approved for subsidized housing where father and J could also live.

At the time of the permanency hearing, J had been living with the same foster care provider for more than a year, where he had made "astronomical" improvements to his aggressive behavior. For example, in the year prior to the hearing, J's age appropriate interactions with peers began at 18 percent. By the time of the hearing, J's interactions increased to 50 percent of them being age appropriate. After his release from prison, father consistently visited J weekly at the department's office, and, twice each month, father's

other children joined those visits. At the invitation of the foster care providers, father began calling J each night to tell him goodnight.

Shortly after father's release from prison, in December 2019, the trial court held the permanency hearing that is the subject of this appeal. On December 4, 2019, 18 months after the juvenile court took jurisdiction over J, and after he had resided in eight different placements, the court held a permanency hearing during which DHS requested that the court change the plan to adoption.

By the time of that hearing, father had abstained from drug use for more than 16 months. Father testified that he understood that he had previously "relapsed" in his drug use when he became "complacent" and "stopped going to meetings," "stopped getting in contact with [his] sponsor," and "walked away from the recovery community[.]" And, while incarcerated, he had come to understand the detrimental impact that his drug use and criminality had on his family. Accordingly, father had focused on surrounding himself with people that would "hold [him] accountable."

At the conclusion of the permanency hearing, the juvenile court noted its concern that DHS had waited almost a year before conducting father's court-ordered psychological evaluation. The court also specified that it had unanswered questions about the authenticity of the psychological evaluation because it took place while father was incarcerated—a time in which a prisoner undoubtedly changes his personality traits in pursuit of prison survival mechanisms, which may be, in the court's opinion, understandably difficult to "turn off" for the relatively brief psychological evaluation. Despite those concerns, however, the juvenile court ultimately determined that DHS made "reasonable efforts to safely return the child home within a reasonable time."

Regarding father's efforts, the court determined that although father's circumstances had changed in that he was no longer acting as a confidential informant, and he had made commendable progress toward sobriety, father would need to show a "sustained recovery" before J could be returned, which could not "be completed immediately." The

court also noted that it was relying heavily on Dr. Clausel's "determination that it would take three years of sobriety in a very structured environment after [father] was released from prison because he was *** the classic 4-9 or psychopathic deviate, hypomania code type found in the primary correctional populations."

On appeal, father raises several arguments, including that DHS did not show how its services gave father a reasonable opportunity to ameliorate the jurisdictional basis, noting that the sole basis alleged and had been proved was "amorphous and ill-defined." Additionally, father argues that DHS did not show that it had discussed J's needs with father nor did it timely show father the results of his psychological evaluation until after he was released from prison, during preparation for the permanency hearing.

DHS responds that its efforts were reasonable. First, DHS argues that the jurisdictional basis reflected in the judgment refers to father's addiction issues and his criminal activity. Viewing its efforts in that context, DHS argues that its efforts were reasonable, highlighting its referral of father to drug and alcohol services, as well as planning for in-home treatment. We turn now to the merits.

Oregon's juvenile dependency scheme balances the rights of children to "[p]ermanency with a safe family"; free "from physical, sexual or emotional abuse or exploitation"; and free "from substantial neglect of basic needs," ORS 419B.090(2)(a), with parents' Fourteenth Amendment liberty interest in parenting their children. ORS 419B.090(4). Under that scheme, ORS 419B.100(1)(c) provides that DHS may allege jurisdiction over a child whose "welfare" is endangered by the child's "condition or circumstances." That provision states that "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and *** [w]hose condition or circumstances are such as to endanger the welfare of the person ***." A child's welfare is "endanger[ed]" within the meaning of the statute if the child is facing a current "threat of serious loss or injury," and there is "a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 385-86, 259 P3d 957 (2011); *see also*

*State ex rel Juv. Dept. v. Smith*, 316 Or 646, 648, 653, 853 P2d 282 (1993) (concluding that, under *former* ORS 419.476 (1)(c) (1993), *renumbered as* ORS 419B.100(1)(c) (1993), a child's "condition or circumstances are such as to endanger" the child's welfare "[i]f, after considering all the facts, the juvenile court finds that there is a reasonable likelihood of harm to the welfare of the child").

After DHS has alleged and proved a basis for establishing jurisdiction, the juvenile court may change a permanency plan from reunification to adoption, only after determining that, under ORS 419B.476(2)(a), (1) DHS made reasonable efforts for the child to safely return home, and (2) despite those efforts, parents have not made sufficient progress to allow the child to safely return home. It is always the burden of DHS to prove by a preponderance of the evidence that its efforts to assist a parent in ameliorating the jurisdictional basis were reasonable. *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). "The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it has required parents to take are reasonable." *Dept. of Human Services v. T. R.*, 251 Or App 6, 13, 282 P3d 969, *rev den*, 352 Or 564 (2012). Whether DHS has provided reasonable efforts should be evaluated "in view of the nature of the parent's problems." *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 802, 284 P3d 1233, *adh'd to as modified on recons*, 253 Or App 600 (2012), *rev den*, 353 Or 445 (2013).

In light of that statutory scheme, the alleged and proven jurisdictional basis becomes critical language—arguably *the* critical language—around which the entire juvenile case orbits. It is the pleaded and proven jurisdictional basis that delineates the authority of the court. For as we have noted, once a juvenile court has taken jurisdiction over a child pursuant to ORS 419B.100(1)(c), the court retains that jurisdiction only so long as "the jurisdictional bases must continue to pose a current threat of serious loss or injury, and there [is] a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. J. V.-G.*, 277 Or App 201, 212, 370 P3d 916 (2016). Further, we have

held that "[i]t is axiomatic that a juvenile court may not continue a wardship 'if the jurisdictional facts on which it is based have ceased to exist.'" *State v. A. L. M.*, 232 Or App 13, 16, 220 P3d 449 (2009) (quoting *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989)). When the basis for jurisdiction has ceased to exist, then the juvenile court must terminate the wardship and dismiss the case, thereby returning the child to the care and legal custody of the child's parents or legal guardians. *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 634, 310 P3d 1186 (2013), *rev dismissed*, 2014 WL 5462426 (2014).

In addition to delineating the authority of the court, the pleaded and proven jurisdictional basis sets the expectation of services provided by DHS. As we recently noted in *Dept. of Human Services v. D. M. R.*, "it is through the lens of the jurisdictional basis that we must analyze the reasonableness of DHS's efforts." 301 Or App 436, 443, 455 P3d 599 (2019). For DHS to meet its burden in showing that its efforts were reasonable, it must show a logical link between those efforts and the specific adjudicated bases for jurisdiction, thereby giving "parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *S. M. H.*, 283 Or App at 306 (internal quotation marks omitted).

For those reasons, the wording of the jurisdictional basis set forth in the judgment *matters*. We recognize that dependency cases involve complicated human lives and relationships, and that the juvenile court may be involved over a period of several years. In such an instance, we do not ignore the reality that "human relationships, circumstances, and actions are never static; they change constantly, sometimes daily." *Dept. of Human Services v. G. E.*, 243 Or App 471, 480, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011). As we have held previously, "the legislature [did not intend] endless sequential motions to amend, and the necessarily ensuing endless delays, every time a minor circumstance changes." *Id.*

Despite those pragmatic acknowledgments, however, flexibility accorded to DHS and a juvenile court cannot come at the expense of notice to a parent. When DHS

alleges and proves a jurisdictional basis for one reason, that cannot become a substitute for other bases neither alleged nor proved. As we have noted, "[i]t is equally axiomatic that a juvenile court may not continue a wardship based on facts that have never been alleged in a jurisdictional petition." *Id*. at 479. We have held:

> "[T]he legislature recognizes two situations in which the facts on which the juvenile court bases jurisdiction differ from facts in the original petition or jurisdictional judgment: situations in which the difference does not affect the substantial rights of the parent, and situations in which it does. ORS 419B.857(2). In the second situation, in order to preserve the substantial rights of the parent, the court must direct that the petition be amended and grant such continuance as the interests of justice may require. ***.
>
> "The proven facts depart from the petition so as to substantially affect a parent's rights if a reasonable parent would not have had notice from the petition or the jurisdictional judgment as to what he or she must do in order to prevent the state from assuming or continuing jurisdiction over the child."

*Id*. at 81. (Internal quotation marks omitted.)

Applying those principle here, we cannot conclude that DHS met its burden to establish that it provided father services sufficiently related to the jurisdictional basis so as to constitute "reasonable efforts" under ORS 419B.476 (2)(a). Once again, the sole jurisdictional basis reflected in the judgment is, "[D]espite prior services offered to the father by DHS and other agencies, the father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child." What those "impediments" are is not specified.

As we noted in *D. M. R.*, DHS's "task—to prove the reasonableness of its efforts—becomes more challenging when DHS chooses to allege and proceed upon a jurisdictional basis [that is] amorphous and ill-defined." 301 Or App at 443. Here, rather than explain how the services provided to father related to his "impediments," DHS's arguments on appeal, both in its briefing and in response to questioning at oral argument in this matter, purport to redefine

"impediments" to mean something else. DHS argues that "impediments," as that term is used in the jurisdictional judgment, is, in fact, a euphemism for father's addiction and criminal activity. As DHS argues, "there was no dispute below that the 'prior services' offered to father addressed his substance abuse and criminal activity. *** And evidence in the record demonstrates that the previous services concerned father's substance abuse."

However, as we have explained above, that argument is untenable. DHS cannot allege a vague and amorphous jurisdictional basis, then swap that term out for something that better matches the efforts provided. In *D. M. R.* we held that "a 'chaotic relationship' is not simply an interchangeable term for domestic violence." 301 Or App at 443. Here, too, "impediments" is not an interchangeable term for addiction or criminal activity.

Even if we were to credit the notion that "impediments" were intended by DHS as euphemisms for criminal activity or addiction, that does not solve the notice problem that creates for father on this record. Here, DHS's petition explicitly alleged both addiction and criminal activity in separate paragraphs:

"e)  Further, the father's substance abuse interferes with his ability to safely parent the child.

"*****

"h)  Further, the father is involved in criminal activities that interfere with his ability to safely parent the child."

However, as we have discussed, the court did not annotate any disposition of "e" or "h." Whatever "impediments" might mean, it cannot mean bases for jurisdiction alleged but *not found* by the juvenile court.

In sum, based on the wording of the sole basis for jurisdiction present in this case, and based on the arguments of DHS before the juvenile court and on appeal, we cannot conclude that DHS met its burden to establish its "reasonable efforts" under ORS 419B.476(2)(a).

Reversed and remanded.