Argued and submitted April 30; reversed and remanded for correction of reasonable efforts determination, otherwise affirmed June 23, 2021

In the Matter of J. D. R. III,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. D. R., Jr.,
*Appellant.*

Columbia County Circuit Court
19JU05079; A175032

493 P3d 567

In this juvenile dependency case, father appeals from a permanency judgment continuing his son J's permanency plan of reunification. Father assigns error to the juvenile court's determination that the Department of Human Services (DHS) had made reasonable efforts to effect reunification, because, father contends, DHS failed to investigate or provide services that were targeted toward his autism spectrum disorder. Jurisdiction as to father was based on father's admission that his autism spectrum disorder with accompanying intellectual impairment "impacted his ability to safely parent *** and maintain a safe and appropriate living environment." *Held*: Considering DHS's efforts through the lens of the critical jurisdictional language in its entirety, DHS's failure to make any efforts tailored to father's disorder rendered the juvenile court's reasonable efforts finding erroneous.

Reversed and remanded for correction of reasonable efforts determination; otherwise affirmed.

Jenefer Stenzel Grant, Judge.

George W. Kelly argued the cause and filed the brief for appellant.

Alex Jones, Certified Law Student, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General.

Before Shorr, Presiding Judge, and Powers, Judge, and Hadlock, Judge pro tempore.

SHORR, P. J.

Reversed and remanded for correction of reasonable efforts determination; otherwise affirmed.

**SHORR, P. J.**

In this juvenile dependency case, father appeals from a permanency judgment continuing his son J's permanency plan of reunification. Father assigns error to the juvenile court's determination that the Department of Human Services (DHS) had made reasonable efforts to effect reunification, because, father contends, DHS failed to investigate or provide services that were targeted toward his autism spectrum disorder. Jurisdiction as to father was based on father's admission that his autism spectrum disorder with accompanying intellectual impairment "impacted his ability to safely parent *** and maintain a safe and appropriate living environment." We agree with father that the juvenile court erred and, accordingly, reverse that aspect of the judgment.

Father has not requested *de novo* review, and we decline to conduct such review here. *See* ORS 19.415(3)(b); ORAP 5.40(8)(c). "We are therefore bound by the juvenile court's factual findings as to what efforts DHS has made, so long as there is any evidence in the record to support them." *Dept. of Human Services v. K. G. T.*, 306 Or App 368, 370, 473 P3d 131 (2020). The juvenile court's determination that DHS's efforts were reasonable constitutes a legal conclusion that we review for errors of law. *Id.* As we discuss further below, there was limited evidence presented at the permanency hearing. Nevertheless, we provide, solely as context, a brief summary of the circumstances that brought the parties before the court, gleaned from the trial court file, with the acknowledgement that those materials are not part of the evidence offered at the permanency hearing.

J was born in August 2017. DHS Child Welfare first became involved in J's care in March 2018 due to concerns that mother and father were neglectful and failed to provide a safe and clean home environment.[1] DHS quickly became aware that both parents were developmentally "delayed" to some extent.

DHS petitioned for dependency in July 2019. The DHS caseworker's affidavit declared that, "[d]espite the

---

[1] Mother is not a party to this appeal, and we discuss her involvement in the case only where needed for accuracy and context.

number of services and amount of assistance DHS has provided[,] the parents cannot maintain the home environment and appropriate supervision of [J]." The home was often in "disarray" and littered with trash. An "in-home plan" was established, which allowed mother and J to stay together outside the home, first with a neighbor and later in a group housing environment. That plan did not include father, apparently because DHS believed that father could not provide parenting assistance and had "not made any changes to his behaviors that led to DHS intervention." Two months later, J was moved into foster care. By that point, J was two years old.

The juvenile court issued a judgment of jurisdiction in November 2019 based on the amended admissions of both parents. As to mother, mother admitted that she was "aware that the father cannot presently safely parent the child, but needs assistance to learn how to best develop the skills to protect the child from father's unsafe caregiving." She also admitted that she had "intellectual capacity limitations that impact[ed] her ability to safely parent." Father admitted that he "was recently diagnosed with Autism Spectrum Disorder with accompanying intellectual impairment, which has impacted his ability to safely parent the child and maintain a safe and appropriate living environment. The father needs the assistance of DHS and the court to receive ongoing services to address these issues."

The court held a permanency hearing on November 4, 2020. At that hearing, the court received two exhibits and considered the unsworn statements of the parties and their attorneys.[2] Exhibit 2, a report from the court-appointed special advocate (CASA), relayed that mother desired to "transition into her own place without [father]" and expressed support for that plan. The CASA opined that father presented a "hurdle" to mother's efforts at reunification due to his difficultly staying "engaged and willing to maintain cleanliness in the home and care for their child." Specifically, the CASA reported that

---

[2] The parties treat the unsworn statements as part of the evidence and the record before us. We assume, without deciding, that those statements were properly considered by the juvenile court.

"[father] has attended Options visits and DHS visits with his son. When visitations occurred at the DHS office, he was often late and sometimes didn't show up at all. When visits transitioned into the home he was often not up when his son was dropped off or unavailable during DHS video check-ins. I do not feel that [father] has progressed since his son was removed from the home. He is disengaged and withdrawn most of the time. He does not appear to recognize the need for safety and cleanliness in the home. He struggles with communicating and interacting with his son. He currently has a room to himself in the house and cannot maintain safety by keeping it clean and safe or leaving a baby gate up at all times. When asked about it, he seems very frustrated with the idea of maintaining its cleanliness for his son and refuses to transition the room into a safe and quiet space for his son to play and nap."

Exhibit 1, the DHS Family Report, noted that father had "vocalized to the agency that he wants to co-parent with [mother]." Father had been attending Options visits but needed "prompts from his Options worker to engage." The report opined that father had "made minimal progress in his case plan," was "resistant to cleaning the apartment," and "often requires prompts and reminders to change his son's diaper, to provide a snack or to follow the set routine."

The DHS report also contained a lengthy narrative as to why DHS believed that substitute care of J remained necessary. That narrative noted that, while DHS had been allowing in-home visitation twice a week, those visits had been temporarily postponed three months earlier because an unannounced visit had discovered the apartment in a filthy and cluttered condition that was not "fit for visitation." The narrative explained that

"mother reported that the father doesn't clean after himself and doesn't help her clean the apartment. Mother reported that the father struggles to get rid of items in the apartment and if the mother tosses items out herself the father *** fished the items out of the garbage and tells her not to throw things away."

DHS declared that "the father does not actively help parent the child during visits" and noted that father "spends the majority of his time in the back bedroom playing video

games or watching tv." The report explained that mother had oscillated between wanting to separate from father and wanting to stay together and go to couple's counseling. DHS expressed "hope that [mother] would separate from [father]." In short, while mother had been "cooperative with the agency" and had been making good progress toward J's return, father had not been making "adequate progress or been cooperative."

Finally, the report contained a section cataloging DHS's efforts to date as to both parents. As relevant here, DHS provided and facilitated visits for both parents, provided medical and dental care through the Oregon Health Plan, provided assistance in securing necessities and other services for J, and provided assistance relating to cleaning and organizing the parents' apartment. DHS also provided referrals for SAFE (to mother), for Iron Tribe, for Options, for psychological evaluations, and for parent mentors.[3]

During the hearing, DHS asked to continue the reunification plan. Counsel for DHS reiterated the sentiments expressed in the exhibits, adding that "we would be in a different position if [mother] was living on her own" because "[mother] has made more progress than [father]."

Father argued that DHS's efforts toward him had not been reasonable, because the efforts provided were largely focused on mother and left him out of the case planning. Father acknowledged that mother was "easier to work with," but asserted that "the very diagnosis [of autism spectrum disorder] that is the basis for jurisdiction as to the father is what made him 'harder to work with,' which is what made him *** be sort of left out of the case planning." He further argued that DHS needed to offer service providers experienced in working with individuals with autism spectrum disorder, because that condition was at the root of both father's and mother's relationship problems and father's parenting problems such as his difficulty communicating

---

[3] The evidentiary record contains no explanation as to what kind of services SAFE or Iron Tribe offer but does indicate that mother was referred to SAFE as a result of DHS's concerns about domestic violence in the home. In the wider trial court file, records indicate that mother resided at Iron Tribe briefly before J was moved into foster care and describes Iron Tribe as "a home for mothers and children with an open [child welfare] case."

and engaging with J and DHS. Father argued that the service referrals that DHS had provided were not tailored to autism spectrum disorder and that father needed "tailored service[s]" and "special assistance." The DHS case-worker admitted, though unsworn, that the agency had "not directly contacted [Columbia Community Mental Health] to see if they have an autism specialist in the program."

The court asserted that "I don't think autism prevents cleaning and maintenance of a space," but also posited that

> "it seems to me that somebody who was—who was skilled in working with autistic people, and was—could act as a counselor and kind of a coach for father would be the appropriate person to help with this. And I don't know if that exists in our community. But that seems to me to be the next—the next effort that should be made."

The court concluded that DHS had made reasonable efforts to reunify the family, while adding that "I do expect there to be additional efforts to find a parent coach, trainer, counselor who is trained in working with autistic adults." In finding reasonable efforts had been made as to both parents, the court incorporated by reference the section of the DHS Family Report cataloging DHS's efforts to date. The court further found that "[m]other's home is unsafe because of father's failure to comply with DHS directives," that father had not made sufficient progress toward reunification, and that substitute care remained necessary due to father's "failure to clean/maintain a clean home where the family lives." The court ordered DHS to "locate and refer Father to [a] therapist skilled in working with autistic adults" and refer father to "the Children's Program Parent Child Interaction." Finally, the court continued the permanency plan of reunification.

Father appeals from the permanency judgment, assigning error to the juvenile court's ruling that DHS had made reasonable efforts to effect reunification as required by ORS 419B.476(2)(a).[4] Specifically, father contends that,

---

[4] The version of ORS 419B.476(2)(a) in effect at the time of the relevant events in this case has since been amended; however, because those amendments do not affect the analysis in this case, we cite the current version of the statute.

in light of the jurisdictional basis of father's admission that his autism spectrum disorder with accompanying intellectual impairment "impacted his ability to safely parent the child and maintain a safe and appropriate living environment" and that he "needs the assistance of DHS and the court to receive ongoing services to address these issues," DHS was required to, at minimum, "attempt[] to provide a service that would help father deal with the impact *** of his autism on his parenting."

In response, DHS contends that its reunification efforts were "complicated by confusion over whether [mother and father] were, or were not, a couple, and the fact that mother was far more committed to taking the steps necessary to be reunified with [J]." Additionally, DHS adds, the agency did provide a variety of services, including counseling, "parent training," and in-home visitation, none of which were successful in "getting father to change his behavior." DHS posits that, although the court's jurisdictional basis as to father "not[ed] his autism spectrum disorder and intellectual impairment," father was "clearly *** on notice that in order to be reunified with [J], he needed to address issues relating to safe supervision and appropriate living conditions." Because "DHS provided services directed toward remediating those jurisdictional bases," the agency argues that its efforts were reasonable.

Having stated the facts and parties' respective arguments, we turn to the applicable law. When a child is subject to juvenile court jurisdiction and that child's permanency plan is reunification, the court must make certain determinations at each permanency hearing, including "whether [DHS] has made reasonable efforts *** to make it possible for the ward to safely return home." ORS 419B.476(2)(a). DHS bears the burden of proving that its efforts were reasonable by a preponderance of the evidence. *Dept. of Human Services v. L. A. K.*, 306 Or App 706, 716, 474 P3d 925 (2020). Specifically, reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. W. M.*, 310 Or App 594, 598, 485 P3d 316 (2021) (internal quotation

marks omitted). As a result, DHS must make reunification efforts directed at each parent individually. *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). The type and sufficiency of efforts required varies and is highly dependent on the particular circumstances of each case. *Dept. of Human Services v. T. R.*, 251 Or App 6, 13, 282 P3d 969, *rev den*, 352 Or 564 (2012). When DHS has failed to offer or provide a particular service to a parent, "we view the adequacy of DHS's efforts in light of the potential benefits that providing that service could have yielded." *Dept. of Human Services v. D. M. D.*, 301 Or App 148, 156, 454 P3d 838 (2019). Finally, our considerations have a temporal component. "DHS's efforts are evaluated over the entire duration of the case, with an emphasis on a period before the hearing sufficient in length to afford a good opportunity to assess parental progress." *S. M. H.*, 283 Or App at 306 (internal quotation marks omitted).

We have previously explained that the specific jurisdictional basis in a given dependency case "delineates the authority of the court" and "becomes critical language—arguably *the* critical language—around which the entire juvenile case orbits." *L. A. K.*, 306 Or App at 716 (emphasis in original). In effect, the jurisdictional language provides the lens through which the reasonableness of DHS's efforts is analyzed. *Id.* at 717. "For those reasons, the wording of the jurisdictional basis set forth in the judgment *matters*." *Id.* (emphasis in original). Our past cases illuminate that DHS's efforts are not reasonable when they are not sufficiently aimed at alleviating the specific controlling jurisdictional basis. *See id.* at 718-19 (DHS did not make reasonable efforts, despite provision of services aimed at the father's substance abuse and criminal activity, where jurisdictional basis did not mention substance abuse or criminal activity and was instead that "father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to the child"); *Dept. of Human Services v. D. M. R.*, 301 Or App 436, 436, 445, 455 P3d 599 (2019) (DHS did not make reasonable efforts where court could not reasonably infer that a referral to Womenspace served to ameliorate the jurisdictional basis of the father's "chaotic lifestyle and chaotic relationship with mother").

Applying that law here, DHS's efforts leading up to the permanency hearing did not afford father a reasonable opportunity to ameliorate the basis for jurisdiction, *i.e.*, that "[t]he father was recently diagnosed with Autism Spectrum Disorder with accompanying intellectual impairment, which has impacted his ability to safely parent the child and maintain a safe and appropriate living environment. The father needs the assistance of DHS and the court to receive ongoing services to address these issues." Although the jurisdictional basis mentions two tangible parenting issues—namely, safe parenting and maintaining a safe and appropriate living environment—those parenting issues are not the entirety of the jurisdictional basis. By the plain language of the judgment of jurisdiction, father's autism spectrum disorder with accompanying intellectual impairment is the root cause that has "impacted [father's] ability to safely parent the child and maintain a safe and appropriate living environment." Despite this, the evidentiary record contains no evidence that DHS made any efforts toward alleviating that root cause, or that DHS conducted any investigation into the availability of services for autistic adults.

DHS argues that *L. A. K.* is not analogous to this case because, there, the father's jurisdictional basis was so vague as to not provide the father with adequate notice of the issues he needed to work on before reunification could be effectuated. Admittedly, here, father's jurisdictional basis is more descriptive, and DHS did provide some services aimed at aspects of that jurisdictional basis. However, those factual differences do not make *L. A. K.* inapplicable. DHS's efforts are not reasonable when they are not aimed at alleviating the court's specific jurisdictional basis. That necessarily requires efforts that address the jurisdictional basis in its entirety, and not efforts that focus on some aspects of jurisdiction while ignoring others. Here, DHS's efforts ignored father's underlying diagnosis, which the jurisdictional judgment identified as the root cause of his parenting issues. And, even if it could have been reasonable for DHS to first attempt to address father's parenting issues with the agency's standard services, it was certainly not reasonable to continue that course of action and never investigate services for autistic adults for nearly a year, particularly after

father failed to make progress with those standard services. Considering DHS's efforts through the lens of the critical jurisdictional language in its entirety, DHS's failure to make any efforts tailored to father's disorder renders the court's reasonable efforts finding erroneous.

We acknowledge that, as in any case, there could be impediments to DHS's provision of certain services, such as availability and cost, although there is not a record developed here to assess that issue. *Cf. K. G. T.*, 306 Or App at 381 (unless provision of a particular service is "truly not possible," juvenile court must weigh the associated costs and benefits of a "needed service" to determine whether DHS made reasonable efforts despite failing to provide the service). DHS's failure to even investigate the existence of services for autistic adults is the factor that renders its efforts unreasonable on this record.[5]

Finally, DHS's argument that we should assess its efforts in light of certain complications—specifically, confusion over "whether [mother and father] were, or were not, a couple" and mother's greater progress toward reunification—is unpersuasive. Neither of those factors have anything to do with DHS's ability to investigate the availability of services for autistic adults. Further, the fact that one parent has proved more successful than the other does not alleviate DHS from the duty to pursue efforts aimed at each individual parent.

In conclusion, the juvenile court erred in finding that DHS had made reasonable efforts to reunify father and J, because there was insufficient evidence to support that determination.

---

[5] As with all assessments of the reasonableness of DHS efforts, our determination is highly dependent on the circumstances of the instant case, including both father's specific jurisdictional basis and the record before us. Our conclusion in this case does not mean that DHS must provide diagnosis-specific services in every dependency case where a parent purports that a specific psychological or neuropsychological diagnosis is the cause of their parenting issues. We do not resolve that issue either way here. Instead, we only conclude that, on this particular record, considering the specific language controlling the court's jurisdiction as to father, DHS's efforts were not reasonable because the jurisdictional language specifies that a named neuropsychological condition is the cause of father's parenting issues and yet DHS failed to investigate the existence of any services tailored toward that condition.

Reversed and remanded for correction of reasonable efforts determination; otherwise affirmed.[6]

---

[6] We note that, although father's successful argument that DHS did not undertake reasonable efforts results in a reversal, we find no error in the juvenile court's permanency judgment to the extent that it continued the permanency plan of reunification.