No. 908 December 18, 2024 843

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

A. C.,
*Respondent,*
*v.*

K. R. K.,
*Appellant.*

Multnomah County Circuit Court
22JU02587; A183730

Kathryn L. Villa-Smith, Judge.

Argued and submitted September 11, 2024.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Stacy M. Chaffin, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christa Obold Eshleman argued the cause for respondent A. C. Also on the brief was Youth, Rights & Justice.

Before Hellman, Presiding Judge, Lagesen, Chief Judge, and Mooney, Senior Judge.

HELLMAN, P. J.

Motion to strike dismissed as moot, affirmed.

**HELLMAN, P. J.**

Mother appeals from a juvenile court judgment changing the permanency plan for her son, A, from reunification to adoption. She challenges the juvenile court's determination that the Department of Human Services (DHS) satisfied its burden to prove that it made reasonable efforts to assist mother in ameliorating the jurisdictional bases. Because we conclude that DHS's efforts toward reunification were reasonable, the court did not err by changing the permanency plan. Accordingly, we affirm.

Mother does not ask us to take *de novo* review, and we decline to do so. ORAP 5.40(8). Accordingly, we are bound by the juvenile court's factual findings if there is any evidence in the record to support them. *Dept. of Human Services v. Y. B.*, 372 Or 133, 136, 546 P3d 255 (2024). As the Supreme Court recently explained, the juvenile court's determination that DHS made reasonable efforts is a legal conclusion that we review for errors of law, and, in so doing, we consider the evidence in the light most favorable to the juvenile court's disposition to determine whether it supports that court's legal conclusions. *Dept. of Human Services v. C. H.*, 373 Or 26, 46-49, __ P3d__ (2024). We state the facts in accordance with that standard.

Mother gave birth to A in January 2022. On May 18, 2022, father called the doctor's office advice line and reported that A had fallen off father's lap three days earlier. The parents described that A had bruising on his head and face and was sick with a fever and vomiting. The nurse advised parents to immediately call 9-1-1. However, parents did not call 9-1-1 until May 23, when A began having seizures and losing function. At the hospital, A was found to have suffered multiple nonaccidental injuries including bilateral subdural hemorrhaging, retinal hemorrhaging, a fractured leg, and a skull fracture. He required intubation to assist with his breathing and a gastric tube for nutrition. Medical staff believed A's injuries were consistent with a diagnosis of physical abuse. DHS removed A from parents' care and, after his release from the hospital, placed him with a resource parent.

Father admitted to DHS that he was the only parent responsible for A's injuries. He was indicted and later pleaded guilty to criminal charges related to A's injuries. He does not appear on this appeal.

Mother, who lived together with father and A, was not home at the time of A's injuries but admitted to being made aware of A's injuries on the day that they occurred. Mother wanted to take A to the hospital sooner but was deterred by father and did not want to involve authorities. She continued to leave A alone in father's care in the days after the injuries occurred. On DHS's petition, the juvenile court asserted dependency jurisdiction over A on the admitted bases, as they related to mother, that:

> "The child is in need of medical treatment that the mother failed to provide.

> "While in the custody of the mother the child suffered an unexplained injury.

> "Due to the mother's mental health and perceived cognitive abilities, the mother does not understand the basic needs of her child and lacks skills necessary to safely parent the child."

Because of his injuries, A requires significant and consistent medical treatment. He has global developmental delays that require various therapeutic treatments. An MRI revealed bleeding in his brain that required surgery. He has had problems with his eyes due to the hemorrhaging, has tubes in his ears, was fitted for leg braces to aid his walking, and has persistent concerns related to seizures. Those conditions require frequent medical visits, physical and occupational therapies, exams, and regular medication.

Mother struggled to understand how A's brain injury has impacted him. Mother did not believe that father would have intentionally injured A and attributed some of A's conditions to hereditary learning disabilities. DHS referred mother to a neuropsychological evaluation with Dr. Sacks, who found that mother suffers from cognitive difficulties and poor decisionmaking, which contributed to the circumstances leading to A's injuries. He recommended "hands-on parenting courses" for mother and that she "undergo

educational efforts for non-perpetrators of child abuse with infants." Sacks also recommended that anyone working with mother "present information in as many modalities as possible. Take breaks frequently to be sure she is following information. Have her attempt to paraphrase information that has already been presented before moving onto the next section." Sacks concluded that mother "does not appear to be a safe parenting resource at present."

DHS referred mother to four different parenting classes that focused on basic parenting skills. Mother regularly attended class meetings and completed three of the four classes. However, even after completing the classes mother continued to struggle with some basic parenting skills. DHS also assigned mother a parent mentor and a parent support worker to help her with parenting skills. DHS offered mother supervised visits and invited her to attend and participate in A's various medical appointments and monthly meetings so that mother could stay informed about A's treatments and goals. DHS provided mother with a $2,000 Lyft voucher and rides so that she could attend those visits. Caseworkers asked medical providers to instruct mother using different modalities and amended instructional documents to be at an appropriate reading level.

Mother frequently attended the appointments and visits, but medical staff and caseworkers expressed concerns about mother's ability to comprehend and apply their instructions. A's therapists reported that mother lacked an understanding of what a child A's age could reasonably and safely do, despite attempting to communicate those limitations to mother in different modalities. The therapists were also concerned because A's treatment necessarily required repetition and practice at home to be successful, and they questioned mother's ability to do so.

Caseworkers reported similar concerns during visits between mother and A, stating that mother often required redirection to respond safely and appropriately to A's cues. For example, when feeding A solid foods, he was struggling to swallow and started to cry. Mother continued to try putting more food in his mouth, failing to understand why he was crying. In another visit, mother watched A stand and

nearly fall off the couch without seeming to understand that it was dangerous for him.

DHS also helped mother acquire her own housing. Before father's incarceration, mother continued to live with father and present as his partner. DHS provided mother with a housing voucher and helped with costs so that mother could get her own apartment.

Approximately 16 months after A's removal from mother's care, DHS sought to change the permanency plan from reunification to adoption. The juvenile court held a permanency hearing, at which a single DHS caseworker testified. According to her testimony, A is "very vulnerable" and requires a highly skilled caregiver to meet his specialized needs. The caseworker did not believe that mother had the capacity to meet those needs. The juvenile court found that A "needs a caregiver who can provide a structured and predictable environment and who can attune to his individual needs." The court concluded that A could not be safely returned to mother's care despite reasonable reunification efforts by DHS, and changed the permanency plan to adoption.

On appeal, mother identifies three primary reasons why, in her view, DHS failed to prove that its efforts qualified as reasonable. The first two reasons relate to recommendations made by the psychologist, Sacks: (1) that mother "undergo education efforts for non-perpetrators of child abuse with infants[,]" and (2) that mother be "present[ed] information in as many modalities as possible" and "[h]ave her attempt to paraphrase information that has already been presented before moving onto the next section." Mother contends that DHS failed to follow either of those recommendations. Third, mother argues that DHS failed to recruit and offer in-home professional safety service providers to mother who could have supported her parenting of A. Because DHS failed to do so, mother asserts that DHS failed to prove that its reunification efforts qualified as reasonable.

When a juvenile court asserts dependency jurisdiction over a child with the plan to reunify the child with the parent, DHS is required to make "reasonable efforts * * * to make it possible for the ward to safely return home." ORS

419B.476(2)(a). Assessing whether DHS's efforts qualified as reasonable requires that we consider the totality of circumstances over the course of the agency's involvement with the family. *C. H.*, 373 Or at 51. Efforts are reasonable when they "focus on ameliorating the adjudicated bases for jurisdiction" and "give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. D. M.*, 310 Or App 171, 183, 483 P3d 1248 (2021) (internal quotation marks omitted). When DHS fails to offer or provide a particular service, "we view the adequacy of DHS's efforts in light of the potential benefits that providing that service could have yielded." *Dept. of Human Services v. J. D. R.*, 312 Or App 510, 518, 493 P3d 567 (2021) (internal quotation marks omitted).

Also important to our review are the bases on which the juvenile court took jurisdiction. That is because, in considering the reasonableness of DHS's efforts, the language of the jurisdictional bases "delineate[] the authority of the court" and "set[] the expectation of services provided by DHS." *Dept. of Human Services v. L. A. K.*, 306 Or App 706, 716-17, 474 P3d 925 (2020). In other words, the specific language of the jurisdictional bases "provide[] the lens through which the reasonableness of DHS's efforts is analyzed." *J. D. R.*, 312 Or App at 518.

Applying those principles here, we conclude that DHS made reasonable efforts to make it possible for A to safely return to mother's care. Important to our disposition is our determination that DHS's efforts were focused on ameliorating the jurisdictional basis of the case—that due to mother's mental health and perceived cognitive abilities, she lacked the skills necessary to safely parent A.[1]

Mother argues that DHS's efforts cannot qualify as reasonable because it failed to follow two recommendations in Sacks's evaluation—that DHS refer mother to a

---

[1] We note that the first two bases for jurisdiction in this case—that the child is in need of medical treatment that mother failed to provide and that while in the custody of mother, the child suffered an unexplained injury—deal with the immediate concerns for A's safety upon entering DHS custody and are less relevant in evaluating whether DHS's efforts throughout the case were reasonable. Neither party appears to argue that those efforts were tied to the first two jurisdictional bases. We therefore focus our analysis on the third basis.

non-offending parent education class and to have mother paraphrase information as it was presented to ensure her understanding. We disagree with mother's argument.

Sacks's recommendation that mother "undergo educational efforts for non-perpetrators of child abuse" is not tied to ameliorating the jurisdictional bases in this case. The caseworker testified that non-offending parent education classes are typically used in cases with "sexual abuse" or "domestic violence." But although this case involves domestic violence, the adjudicated bases for jurisdiction as to mother did not require that DHS make efforts related to mother's relationship with father. Instead, they required DHS to focus its efforts on helping mother understand and gain skills related to the basic needs of A with consideration towards mother's perceived cognitive abilities. It is that specific language—and not the language from a psychological evaluation—that "sets the expectation of services provided by DHS." *L. A. K.*, 306 Or App at 717. DHS's efforts focused on that basis and the juvenile court did not err in concluding the efforts were reasonable, even without referring mother to a nonoffending parent education class.

Similarly, the juvenile court did not err when it determined that DHS's efforts were reasonable notwithstanding the fact that DHS did not require caseworkers and service providers to ensure that mother paraphrased information she learned, as Sacks recommended. Again, we refer back to the jurisdictional basis, which is that mother lacked the skills necessary to safely parent A due to her perceived cognitive abilities, and consider what efforts DHS made to ameliorate that basis. The record shows that DHS referred mother to four different parenting classes. She completed two of them on her own and completed one with father. Mother attended and was engaged in the classes, which focused on building parenting skills and involved "repeating information over and over" and "one-on-one really hands on" work with mother to "try to ensure that she was understanding." The fourth class, which mother did not attend, was a "specialized parenting class" for parents with "cognitive difficulties" because it "move[ed] at a slower pace, [had] more one-on-one time, [and] coaching."

Caseworkers also spoke with A's service providers to ask that they follow Sacks's recommendations for "how they're providing that information to [mother]." The caseworker testified that she instructed the service providers to provide mother information using "multiple modalities," including providing direct instruction, demonstrations, written instruction, and instruction through pictures. When mother participated in A's therapy sessions, they were "focused toward [mother] and helping her understand what they're teaching."

DHS took a similar approach when facilitating visits between mother and A. There were concerns during some visits about mother's ability to understand the cause and effect of A crying, or anticipating when he was in danger of falling, and agency staff talked to mother about it "in different ways" to help her understand what A needed. Caseworkers also amended any instructional documents that they gave to mother to be at an appropriate reading level. Those efforts are consistent with recommendations in Sacks's evaluation that DHS "observe [mother's] visits with [A] and provide hands-on parenting training to support her" and "[w]hen working with [mother], present information in as many modalities as possible." That DHS did not explicitly implement one of the many recommendations in Sacks's report to address mother's perceived cognitive abilities does not render DHS's efforts unreasonable, in light of the efforts that DHS made to work with mother at her level and to provide information in accessible formats.

Finally, mother contends that DHS did not make reasonable efforts because it did not identify or provide professional safety service providers who could offer "24/7" in-home monitoring of mother's parenting. DHS referred A for developmental disability services, which he qualified for. Those services can sometimes involve in-home support. However, at the time of the permanency hearing, A had not yet undergone an evaluation to determine which specific services he would qualify for. In seeking the change in plan, DHS submitted that, "[t]here are professional safety service providers, but unlike in other cases where that 24/7 need may be temporary and then lessens over time, with this

case it is felt that this need would likely be longer term, and professional safety service providers work on a limited contract." DHS worked with mother to identify "significant natural supports" in mother's life who could serve as a safety service provider but was unable to identify any options. Under the circumstances, those efforts were reasonable.[2]

In conclusion, DHS's efforts focused on ameliorating the adjudicated bases for jurisdiction to make it possible for A to safely return to mother's care, and the juvenile court did not err when it changed the permanency plan for A from reunification to adoption.

Motion to strike dismissed as moot, affirmed.

---

[2] Mother filed an emergency motion to strike a portion of A's attorney's answering brief, which cited to a website as support for assertions that A would not qualify for in-home level of care. Because consideration of that issue is unnecessary for our resolution in this case, that motion is moot.