No. 261                  March 26, 2025                  259

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. R. L. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. L. D., Jr.,
*Appellant.*

Yamhill County Circuit Court
24JU02740; A185199

John L. Collins, Senior Judge.

Argued and submitted January 29, 2025.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Megan Mizuta, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

POWERS, J.

Reversed.

**POWERS, J.**

In this juvenile dependency proceeding, father appeals from a judgment asserting dependency jurisdiction over his child, who was three years old at the time of the trial. In two assignments of error, father asserts that DHS failed to adduce sufficient evidence for the juvenile court to assert jurisdiction over child. The evidence in the record establishes that child had been in danger at the time she was removed from the home. The focus of the court's inquiry, however, is on the condition of the home at the time of the jurisdictional trial. Based on a review of the entire record, there is insufficient evidence that the condition of the home as it relates to the particular allegation—*viz.*, the failure to maintain a safe environment for child because drug paraphernalia and controlled substances were found within reach and child was exposed to controlled substances—at the time of trial posed a risk of harm to child that was reasonably likely to occur. In short, as explained more thoroughly below, we conclude that the record contains insufficient evidence to support jurisdiction based on the only allegation at issue. Accordingly, we reverse.

Neither father nor the Department of Human Services (DHS) has requested *de novo* review, and this is not an exceptional case in which we would exercise our discretion to do so. *See* ORS 19.415(3)(b); ORAP 5.40(8)(c) (explaining that we exercise our discretion to review *de novo* "only in exceptional cases"); ORAP 5.40(8)(d) (outlining nonexclusive list of criteria relevant to the exercise of discretionary authority to review *de novo*). Therefore, we review the evidence in the light most favorable to the juvenile court's disposition as supplemented and buttressed by permissible derivative inferences and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We set out the facts in accordance with our standard of review.

In May 2024, father, mother (who is not a party to this appeal), and child were living in the home of father's former coworker, Carmen. Prior to moving into Carmen's home, mother and child were living in mother's adult daughter's

apartment, and father was unhoused. Father moved into Carmen's house about a month before mother and child also moved in. Although it is disputed where the family slept in the house, the family kept their belongings in one of the bedrooms, which was referred to as the office.

About a week after mother and child moved into Carmen's home, law enforcement searched the home for drugs and firearms. The officers found more than 34 grams of methamphetamine and a scale in an unlocked safe under the desk in the office and found a crystal-like substance and a scale on the desk in the office. In the same room, officers found a bulletproof vest, some unidentified pills, and a bottle of Naloxone, which is used to prevent opiate overdoses. Other contraband and drug paraphernalia were found in other parts of the house, including a firearm found in the vent of the bathroom that the family used. Following the search, DHS removed child, who tested positive for methamphetamine and fentanyl. DHS then filed a dependency petition, and the court held a dependency trial about two months later.

At the time of the trial, father and mother were still living in Carmen's home and planned to stay there until they found alternative housing; Carmen had been arrested and was being held in pretrial detention. The record is unclear as to whether Carmen could be released and then return to the home. At trial, father testified that he was unaware that Carmen was dealing drugs, but the juvenile court did not find father's assertion credible. Moreover, other evidence in the record indicated that father knew that there was drug activity in the home but did not know the extent of the activity. For instance, father testified that in the month he lived in the house, he had seen three to five people, on average, visit the house briefly each day. Father further explained that, after Carmen was arrested, people still came by the house looking for Carmen and that, if father had not been living there, the house could have been "ransacked and turned into a trap house, people would have been flopping there."

Father testified that he and mother had cleaned the common areas of the house, including wiping down the

walls and mopping, after Carmen's arrest. Father clarified that, although he had cleaned the office, he had not removed Carmen's personal belongings, such as his clothes, shoes, and furniture. A detective who had been at the house during the search testified that, following the search, all the dangerous substances were removed from the property and that what was left on the property were substances that were either deemed safe, not controlled, or not known to the officers. The detective explained, "We wouldn't have left evidence behind that we would have thought to be evidence." A caseworker testified that DHS had not done a walk-through of the home to determine if it was safe.

The juvenile court asserted jurisdiction over child based on the following allegation:

> "The father failed to maintain a safe environment for the child in that drug paraphernalia and controlled substances were found within the child's reach and the child was exposed to controlled substances, placing the child at risk of harm."[1]

In an extensive oral ruling, the juvenile court found that father was not credible when he represented that he was unaware that Carmen was dealing drugs out of the house. Specifically, the court found that father knew it was a "drug house" and allowed child to live there. The court further found that, even if the family did not sleep in the office, the family still frequently used the room and that is where child was exposed to drugs. Moreover, the court explained that the "biggest weight the Court puts on is [father] put [child] in a position of harm and she was in fact harmed by the presence of methamphetamine and Fentanyl in her system by contact." The court reasoned that, although "a [lot has] been done to clean that environment up[,] *** it still worries me that there might still be some things in [the office] that might be transferred in some way to [child] if she's back with him in that environment." The court further explained that, if DHS was going to return child to that home, "they're

---

[1] The juvenile court dismissed an identical allegation as to mother. However, the court further asserted jurisdiction over child based on mother's admitted allegation that her substance abuse impairs her ability to safely parent. The court also dismissed an allegation as to father that he is unable or unwilling to protect child from mother's substance abuse.

going to have to do some really good close inspection. Almost take a drug [detection] dog in there or something, whatever you need in order to make sure that it's a safe * * * and clear residence." The focus of the court's ruling was that there was still a danger to child because of the "circumstances that [father] allowed [child] to be in" and that the court was "not satisfied sufficiently that that kind of situation would not arise again."

On appeal, father argues that there is insufficient evidence in the record of a current risk of harm to child if she were returned to the home. Father contends that, at the time of the trial, the parents were still living at Carmen's home, but it had been cleaned and DHS had not inspected the current condition of the home. Specifically, father asserts that, because Carmen was no longer living in the home and law enforcement had removed drugs and dangerous items from the premises, the court's concerns that there might be traces of controlled substances in Carmen's belongings that were left behind was based on impermissible speculation. DHS remonstrates that the evidence in the record supports the juvenile court's conclusion because "the room where [child] was exposed to drugs had not been cleaned or cleared of the friend's belongings—combined with father's past act of having allowed [child] to be exposed to drugs, drug paraphernalia, and weapons and his denial at the hearing that he was aware that the house was a drug house or that [child] had access to the room where drugs were found" demonstrate that father's circumstances still pose a risk to child. DHS further argues that the evidence was sufficient to support an inference that father was likely to fail to recognize or actively ignore risks of harm to child, including drug exposure. We conclude that DHS failed to offer sufficient evidence to prove the basis for jurisdiction, *viz.*, that the current circumstances of the house exposed child to a current threat of serious loss or injury that is likely to be realized.

The applicable legal principles are not in dispute. A juvenile court may assert dependency jurisdiction over a child whose "condition or circumstances are such as to endanger the welfare of" the child. ORS 419B.100(1)(c). In order for a court to do so, DHS must establish that the child's

condition or circumstances "expose the child to a current threat of serious loss or injury that is likely to be realized." *Dept. of Human Services v. A. W.*, 276 Or App 276, 278, 367 P3d 556 (2016). Moreover, the threat of harm must be current and nonspeculative; it is not sufficient for DHS to prove that the child's welfare was endangered in the past. *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012).

We conclude that this case involves a failure by DHS to offer sufficient evidence to sustain the allegation in the dependency petition. In dependency cases, "the alleged and proven jurisdictional basis becomes critical language— arguably the critical language—around which the entire juvenile case orbits." *Dept. of Human Services v. L. A. K.*, 306 Or App 706, 716, 474 P3d 925 (2020) (emphasis omitted). Here, the specific jurisdictional basis alleged in the petition was that father "failed to maintain a safe environment for the child in that drug paraphernalia and controlled substances were found within the child's reach and the child was exposed to controlled substances, placing the child at risk of harm." That allegation focuses on harm created by exposure to controlled substances and drug paraphernalia, especially those items being within child's reach. Thus, we focus our analysis on whether there is evidence of a current risk to child from father failing to maintain a safe environment where child would have access to drug paraphernalia and be exposed to controlled substances.

DHS adduced evidence that father and mother still lived in the home and that Carmen's belongings were in the home at the time of the trial. DHS, however, did not offer evidence that it inspected the home or offer any direct evidence of its condition since Carmen's arrest. The evidence about the condition of the home at the time of trial was that father and mother had been cleaning the home "for awhile now" by wiping down walls and mopping the floor. It is true that Carmen's personal belongings were still in the house, but a detective testified that law enforcement had removed the evidence of drug activity from the home and that most of the drugs were found in a safe and on the desk in the office rather than among Carmen's belongings. For instance, the

only evidence relating specifically to fentanyl in the home was the bottle of Naloxone that had been found in the office and removed by law enforcement. Given the record, it would require impermissible speculation to conclude that the home was an unsafe environment at the time of the dependency trial. That is, although the past condition of the home and the fact that child tested positive for methamphetamine and fentanyl is part of the totality of the circumstances, there still must be some evidence regarding the dangerous condition of the home at the time of trial. *See M. Q.*, 253 Or App at 787 (explaining that jurisdiction "cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains"). DHS never inspected the home, and it did not offer sufficient evidence of its current condition to demonstrate that the home was unsafe beyond the speculation that drug residue could be found in Carmen's belongings.

Indeed, the juvenile court appeared to acknowledge the lack of evidence when it explained that DHS would need to do a "close inspection" of the house to "make sure that it's a safe *** and clear residence." DHS had the burden to prove the basis for dependency jurisdiction, and an acknowledged lack of evidence that the house was safe amply demonstrates that the evidence that the house was unsafe is insufficient.

There is no question that child had been in danger at the time she was removed from the home, and it is understandable that there was concern that father allowed child to live in the home and did not recognize the danger it posed. Nevertheless, the focus of the inquiry is on the condition of the home at the time of the dependency trial. As concluded above, there is insufficient evidence that the condition of the home as it relates to the particular allegation—drug paraphernalia and controlled substances being in child's reach—at the time of trial posed a risk of harm to child that is reasonably likely to occur. That allegation does not involve potentially dangerous people coming to the home multiple times per day or that father was exhibiting poor judgment in allowing child to live in a drug house or his

inability to recognize what is and is not a safe environment for child.[2]

Reversed.

---

[2] Moreover, there is no evidence in the record that father was involved in Carmen's drug activity. Indeed, DHS conceded in its closing arguments,

"I'm not saying that [father] had anything to do with the drug dealing, we have no allegations like that, but the allegation is he knew that was going on and he allowed his family, specifically his child, to live in that environment where [child] *** somehow ingested methamphetamine and Fentanyl."