Argued and submitted March 19, reversed April 14, 2021

In the Matter of A. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

W. M.
and A. G. S.,
*Appellants.*

Deschutes County Circuit Court
17JU07861; A174591

485 P3d 316

Mother and father each appeal a permanency judgment that changed the permanency plan for their three-year-old daughter, A, from reunification to guardianship. They contend that the juvenile court erred when it determined that the Department of Human Services' efforts afforded them the opportunity to become minimally adequate parents even though, as a result of the COVID-19 pandemic, they could not obtain the in-person training they need to develop the skills to manage A's serious feeding disorder. *Held*: The trial court erred in changing the permanency plan from reunification to guardianship. On this record, parents were not given a reasonable opportunity to become adequate parents by learning to manage A's feeding disorder.

Reversed.

Walter Randolph Miller, Jr., Judge.

Holly Telerant, Deputy Public Defender, argued the cause for appellant A. G. S. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

George W. Kelly filed the brief for appellant W. M.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

LAGESEN, P. J.

Reversed.

LAGESEN, P. J.

Mother and father each appeal a permanency judgment that changed the permanency plan for their three-year-old daughter, A, from reunification to guardianship. They contend that the juvenile court erred when it determined that the Department of Human Services' (DHS) efforts afforded them the opportunity to become minimally adequate parents even though, as a result of the COVID-19 pandemic, they could not obtain the in-person training they need to develop the skills to manage A's serious feeding disorder. We agree and reverse.

Shortly after A was born in 2017, she and her two older brothers were removed from parents' care. The juvenile court took dependency jurisdiction over A on the ground that both parents "lack[ed] the stability and parenting skills to meet the child's needs and safely parent the child." At the time, A had a hemangioma near her eye that needed treatment, and the primary concern was that parents, who were 19 and 20, did not have the skills to address the medication schedule and other issues related to that.

By the time of the permanency hearing at issue here, A's brothers had been returned to parents' care. As for A, the eye issue had largely resolved, but it had become apparent that A had a very serious feeding issue. She had been receiving therapy for it while in foster care, but initial efforts to treat it had not been successful and, in fact, may have been misdirected. In early 2020, however, A began treatment with an occupational therapist, Linden, and began to make progress. Linden attributed some of A's progress to "food play" opportunities that A's foster mother was providing her.

Because of COVID restrictions, the therapy has occurred via telehealth since the end of March 2020; one in-person session was held before the pandemic struck. As of the permanency hearing, a total of 12 therapy sessions had been held; mother and father attended nine of them but missed three. Parents had to participate remotely. In Linden's view, mother needed in-person, "hands-on" coaching to acquire the skills to address A's feeding issues but

"COVID doesn't allow us to do that for treatment sessions." "From a therapeutic standpoint, [the ideal] would just be increased participation in the feeding sessions we have now. I would not recommend feeding until I can see that bio[logical] parents can demonstrate understanding with [A]." Linden also thought that it would be necessary to evaluate mother one-on-one with A to assess how mother was doing with A's feeding sessions.

Parents' ability to address that feeding issue was the primary concern at the permanency hearing. DHS contended that its efforts to reunify the family had been reasonable throughout the life of the case, but that parents had not made sufficient progress to allow A to return home. It contended further that parents had been inconsistent in showing up for appointments prior to COVID, and that, notwithstanding COVID, "it is also important for [A's] needs that parents can demonstrate that in spite of a family illness or in spite of other setbacks, they would be able to consistently meet [A's] needs."

Although parents acknowledged that they had not followed through with everything that DHS asked them to do, they argued that, due to the combination of COVID restrictions, A's intensive needs, and the recent change in the therapeutic approach to A's feeding disorder, notwithstanding DHS's reunification efforts to date, they had not had a fair opportunity to demonstrate that they could appropriately manage A's feeding disorder. They also argued that it was in A's best interests that the plan remain reunification. They did not dispute, though, that they had not made sufficient progress for A to return home at that time.

The juvenile court changed the permanency plan from reunification to guardianship. Addressing the fact that COVID meant that parents had not been able to have in-person training with Linden to learn to address A's feeding disorder, the court acknowledged that it was "sensitive to the idea that that would have an impact on this proceeding." Nevertheless, the court determined that "[t]he bottom line is, [A] needs medical attention whether or not COVID exists or does not exist. And if that's the environment

that has changed the world, then that's the environment that's changed the world, and [A's] needs still remain. And so people need to adjust." The court further determined that "there would have been ways \*\*\* for [mother] to succeed, [father] to succeed, and I just don't think that that's happened."

Parents both have appealed and challenge the permanency plan change. Although both acknowledge that they had not made sufficient progress at the time of the permanency hearing to allow A to return safely home, they contend that, under our case law, the juvenile court's reasonable-efforts determination was erroneous because it did not adequately account for the way the COVID pandemic interfered with parents' ability to develop the skills needed to deal with A's feeding disorder. They argue that the error requires reversal. We agree and reverse.

Under ORS 419B.476, to change a child's permanency plan away from reunification, the juvenile court must make two predicate determinations: (1) that DHS has made "reasonable efforts" to reunify the family; and (2) that, notwithstanding those efforts, parents have not made sufficient progress to permit reunification. *Dept. of Human Services v. V. A. R.*, 301 Or App 565, 567, 456 P3d 681 (2019).

"Reasonable efforts" for purposes of ORS 419B.476 (2)(a) are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give 'parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.'" *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 137-38, 413 P3d 1005 (2018) (quoting *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 306, 388 P3d 1204 (2017) (second internal quotation marks omitted)). The assessment of the reasonableness of DHS's efforts has a temporal component. Although we take into account DHS's efforts over the life of the dependency case, the focus is on the period of time leading up to the permanency hearing. *S. M. H.*, 283 Or App at 306. To qualify as reasonable, the efforts must go on long enough to allow for a meaningful assessment of whether parents are making sufficient progress to permit

reunification. *Id.* Ultimately, whether DHS's efforts afford a parent or parents the requisite reasonable opportunity to address the jurisdictional bases turns on the particular circumstances of each case. *V. A. R.*, 301 Or App at 567-68.

Here, the circumstances do not allow for the conclusion that DHS's efforts leading up to the permanency hearing gave parents a reasonable opportunity to address the jurisdictional bases. The specific impediment to reunification, everyone seemed to agree, was parents' inability to manage A's serious and complicated feeding disorder. Although the feeding disorder had been diagnosed early on, and attempts had been made to treat it, it was not until early 2020 that, upon beginning therapy with Linden, A began to improve. That is, although parents had not made progress in addressing A's feeding disorder prior to 2020, neither had the professionals trying to address it; it is difficult to see how parents could have succeeded when professional therapeutic measures were not working. According to Linden, for mother to develop the skills to address the feeding disorder would require in-person, hands-on work with Linden and A, something that the pandemic prevented from happening. In essence, given that the pandemic made it difficult, if not impossible, for mother to receive the type of training that Linden believed was necessary for her to become a minimally adequate parent, DHS's efforts must extend long enough to allow for parents to obtain the type of training the pandemic has prevented them from having, and long enough to allow for meaningful assessment of whether that training will permit them to be minimally adequate parents.[1] *See V. A. R.*, 301 Or App at 570-71 (DHS's efforts were not reasonable where it was undisputed that the mother required hands-on training to become minimally adequate parent, but, as of the permanency hearing, training had not been going on long enough to allow for the meaningful assessment of the mother's progress). Although the juvenile court stated on the record that there were ways for parents "to succeed"

---

[1] DHS has not suggested that, in the absence of the pandemic, mother would not be afforded the in-person training she requires. In other words, we understand this to be a case in which, but for the pandemic, mother would receive direct, hands-on, in-person training in working with A.

notwithstanding the lack of in-person training, the record does not contain evidence to support that determination.[2]

Arguing to the contrary, DHS contends that we should focus on the other efforts that DHS made to assist parents before the pandemic started, noting that parents were not always fully engaged with those efforts. But on the facts of this case, those observations, while accurate, do not lead to the conclusion that parents were afforded a reasonable opportunity to become minimally adequate parents to A. A had a complex feeding disorder, she was not responding to therapeutic intervention, and, by the time an appropriate form of therapy was identified, pandemic restrictions precluded parents from participating meaningfully in that therapy. That deprived them of the opportunity to gain the skills they needed to parent A. Under our case law, unless DHS seeks to be excused from making reasonable efforts— something it has not done here—parents are entitled to efforts that extend long enough to allow them a reasonable opportunity to become minimally adequate parents.[3] *Id*.

At oral argument in this case, both sides analogized this case to those in which a parent's incarceration has precluded them from obtaining the services needed to become minimally adequate parents, but we do not view incarceration as analogous to a pandemic. In a case involving an incarcerated parent, it is typical for the fact of incarceration to itself be the basis for dependency jurisdiction on the ground that the child is endangered by the parent's unavailability to parent. *See, e.g.*, *L. L. S.*, 290 Or App at 140. In such a case, to achieve reunification and end state involvement, an incarcerated parent ultimately must ameliorate

---

[2] In inferring that there were ways for parents to succeed, the court appeared to rely on the fact that foster mother was making progress with A's feeding disorder through Linden's training. That foster mother was having success does not support that inference. The therapy, as described by Linden, was based in part on relating to A in a particular way. A was physically present with foster mother to work on that relationship; parents were not. Also, that one person can succeed without in-person training does not, in and of itself, warrant an inference that another person can.

[3] Because DHS did not seek to be excused from making reasonable efforts, we are not called upon to determine when, if at all, extraordinary circumstances beyond anyone's control might be grounds for relieving DHS of its reasonable efforts obligation.

the risks to the child presented by parental unavailability, whether by enlisting the help of others, *see, e.g.*, *id.* at 140-41, by becoming personally available to parent, *see, e.g.*, *T. W. v. C. L. K.*, 310 Or App 80, 93, 483 P3d 1237 (2021), or by otherwise addressing the risks posed to the child. By contrast, in this case, the presence of the pandemic has nothing to do with the grounds for jurisdiction, and we see no legal basis for concluding that parents must, on their own and without the services that would be available in normal times, overcome the impediments to services that have been occasioned by this extraordinary, but temporary, worldwide pandemic.

Our case law provides that parents are entitled to efforts that give them a reasonable opportunity to learn to manage A's feeding disorder. Although DHS's efforts have been admirable under these very difficult circumstances, because of the pandemic, they are not ones that have afforded parents the reasonable opportunity to which they are entitled. Accordingly, we reverse.

Reversed.