Argued and submitted July 7; on respondent's motion to dismiss filed June 7, and appellant's response to respondent's motion to dismiss filed June 16, motion to dismiss denied; "Supplemental Findings Re Reasonable Efforts" order reversed and remanded, order requiring mother to submit to psychological evaluation vacated and remanded, otherwise affirmed September 14, 2022

In the Matter of O. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. K.,
*Appellant.*

Wallowa County Circuit Court
19JU09318; A177559 (Control), A177567

517 P3d 1044

In the context of a permanency judgment involving her child, J, mother challenges the juvenile court's reasonable efforts determination and its order requiring her to undergo a psychological evaluation. *Held*: (1) The court erred in concluding that the Department of Human Services' efforts were reasonable where mother and J had had only one in-person family therapy session, facilitated by J's therapist, in the 14 months since J entered substitute care, despite the recommendations of the mental health professionals involved that therapeutic visitation/family therapy with a neutral provider was key to the possibility of reunification, and the juvenile court had, six months prior to the conclusion of the permanency hearing, ordered that in-person therapeutic visitations begin as soon as possible. (2) Mother's challenge to the psychological-evaluation order was not moot. On the merits, the juvenile court erred in ordering mother to undergo a psychological evaluation without making the factual findings required by *Dept. of Human Services v. W. C. T.*, 314 Or App 743, 776, 501 P3d 44 (2021).

Motion to dismiss denied. "Supplemental Findings Re Reasonable Efforts" order reversed and remanded; order requiring mother to submit to a psychological evaluation vacated and remanded; otherwise affirmed.

Thomas B. Powers, Judge.

Holly Telerant, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F.

Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Motion to dismiss denied. "Supplemental Findings Re Reasonable Efforts" order reversed and remanded; order requiring mother to submit to psychological evaluation vacated and remanded; otherwise affirmed.

**SHORR, P. J.**

In these consolidated dependency appeals, mother challenges two juvenile court orders arising out of a permanency hearing involving her child, J:[1] (1) an order of "Supplemental Findings Re Reasonable Efforts"[2] and (2) an order requiring mother to undergo a psychological evaluation. As explained below, we agree with mother that the juvenile court erred in determining that the Department of Human Services (DHS) made reasonable efforts toward reunifying J with mother. We therefore reverse the supplemental order and remand for the court to enter a new permanency judgment specifying that DHS did not make reasonable efforts. *See Dept. of Human Services v. J. F. D.*, 255 Or App 742, 750 n 4, 298 P3d 653 (2013) (where parties did not dispute permanency disposition, new judgment specifying that DHS did not make reasonable efforts was necessary on remand "because changing the reasonable efforts conclusion has collateral consequences regardless of whether the approved plan is changed").[3] As to mother's challenge to the psychological-evaluation order, we reject DHS's contention that the appeal is moot, and we vacate and remand the order in light of *Dept. of Human Services v. W. C. T.*, 314 Or App 743, 501 P3d 44 (2021).

## I. ORDER FOR PSYCHOLOGICAL EVALUATION

In somewhat unconventional fashion, we begin by first disposing of mother's challenge to the juvenile court's order requiring her to submit to a psychological evaluation,

---

[1] J uses the personal pronouns he/him or they/them. Accordingly, we will use they/them in this opinion.

[2] Mother moved for summary determination of appealability of this order under ORS 19.235(3). The Appellate Commissioner concluded that the order supplemented the court's permanency judgment and, thus, in light of *Dept. of Human Services v. J. D. R.*, 312 Or App 510, 493 P3d 567 (2021), and *Dept. of Human Services v. R. O.*, 315 Or App 487, 497 P3d 329 (2021), *rev dismissed*, 369 Or 508 (2022), was appealable under ORS 419A.405(1)(d).

[3] We view the supplemental order as part and parcel of the permanency judgment; as noted below, the juvenile court expressly provided in the permanency judgment that the judgment would be supplemented by the court's findings in support of its reasonable-efforts determination. The parties do not challenge other aspects of the permanency judgment, including the disposition; accordingly, we otherwise affirm that judgment.

which she presents as her second assignment of error in this appeal. Briefly, prior to the commencement of the permanency hearing that gave rise to the appeal, DHS filed a motion requesting the court to order a psychological evaluation of mother, arguing that it was authorized under both ORS 419B.337(2) and ORS 419B.387. Mother filed a written objection to DHS's motion and also argued against it at the permanency hearing. The court rejected mother's arguments and, on November 16, 2021, entered an order requiring the psychological evaluation and providing that the completed evaluation "shall be disclosed to the court and the parties for use in the judicial proceedings." On January 8, 2022—while this appeal was pending—mother notified the juvenile court that, although she "respectfully disagree[d] with the Court's order," she would submit to the evaluation to move the case along and to "demonstrate [her] willingness to cooperate with DHS towards reunification." She subsequently completed the evaluation and shared it with DHS.

DHS then moved to dismiss mother's appeal as moot, arguing that it no longer has a practical effect on mother's rights. Mother responds that her challenge to the order is not moot because a decision in her favor could provide a basis for limiting or excluding the use of the evaluation as evidence against her in the ongoing dependency proceedings or a future termination of parental rights proceeding. We agree with mother that her appeal of the order is not moot. *See Dept. of Human Services v. T. L. H.*, 300 Or App 606, 613, 453 P3d 556 (2019) (concluding that appeal was not moot in similar circumstances). Mother's letter to the court did not, as DHS contends, waive any challenge to the subsequent use of the evaluation in future proceedings. *W. C. T.*, a case in which the mother had already waived DHS's release of her records and had not developed any further argument as to what underlying information was still at issue, is inapposite in that respect. 314 Or App at 779.

As to the merits of mother's challenge to the psychological-evaluation order, DHS concedes the error, acknowledging that the juvenile court did not make the factual findings required under the four-part standard

articulated in *W. C. T.*, 314 Or App at 776.[4] We agree and accept DHS's concession; accordingly, we vacate and remand the psychological-evaluation order. *See, e.g.*, *Dept. of Human Services v. B. F.*, 318 Or App 536, 540, 507 P3d 350 (2022) (vacating and remanding portion of judgment requiring the father to submit to a psychological exam); *Dept. of Human Services v. M. D.*, 316 Or App 820, 823, 503 P3d 1275 (2022) (vacating and remanding for application of *W. C. T.* standard where court had failed to make three necessary findings derived from ORS 419B.387).

## II.   REASONABLE EFFORTS DETERMINATION

We turn to our review of the juvenile court's reasonable efforts determination, starting with our standard of review.

### A.   *Standard of Review*

In the absence of *de novo* review, which is neither requested nor warranted in this case,

> "[w]e are *** bound by the juvenile court's factual findings as to what efforts DHS has made, so long as there is any evidence in the record to support them. *Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013). Whether those efforts constitute 'reasonable efforts' for purposes of ORS 419B.476(2)(a) is a question of law that we review for legal error. *Dept. of Human Services v. V. A. R.*, 301 Or App 565, 567, 456 P3d 681 (2019)."

*Dept. of Human Services v. K. G. T.*, 306 Or App 368, 370, 473 P3d 131 (2020).

### B.   *Facts*

DHS first became involved with this family in December 2019, when J, who was then 12 years old, was hospitalized for suicidal concerns. J had locked themself in a bathroom in the family home with a butcher knife and was proceeding to cut or had cut themself. At the hospital, J told hospital staff that they would harm themself if returned to mother's care. Mother indicated that she did not want J to be treated with anything but homeopathic medications.

---

[4] *W. C. T.* was decided after the permanency hearing that gave rise to this appeal.

Mother also initially did not want J admitted to a psychiatric hospital, as J's medical providers recommended. DHS sought protective custody to ensure that J would receive mental health services.

At the original shelter hearing, father was given temporary custody of J and DHS was dismissed. After learning that father was not able or willing to ensure that J received the mental health services that they needed,[5] DHS filed an amended dependency petition on January 30, 2020, and J was placed in substitute care at that time.

The juvenile court took dependency jurisdiction over J in early April 2020. As to mother, jurisdiction was based on her admissions that (1) "[J] has emotional and mental health needs that require treatment that the mother has failed to provide" and (2) "the mother's mental health problems interfere with her ability to safely parent the child."[6] Reunification with a parent was identified as the permanency plan for J.

J has been in a variety of placements over the course of this case. Between January and June 2020, they were placed in nonrelative foster care in Enterprise, they then moved to a psychiatric care facility at Trillium Family Services, where they spent a week before being returned to the foster care placement in Enterprise, followed by a brief placement with their maternal grandmother, and a nonrelative foster care placement in Baker City.

In May 2020, Dr. Dudley completed a psychological examination of J and diagnosed them with major depressive disorder, recurrent, of moderate to severe level; an unspecified anxiety disorder; and post-traumatic stress disorder. Dudley also indicated that J "was developing a characterological structure with quite maladaptive style of interpreting and responding to stress and interpersonal interactions including self-harm behaviors and heightened

---

[5] J also alleged that father had pushed them down the stairs.

[6] Jurisdiction as to father was based on his admissions that "[J] has emotional and mental health needs that the [f]ather has been unable or cannot provide"; "the [f]ather is not a custodial resource"; and "[J] is alleging [f]ather has caused [J] physical injury and if returned to his care, [J] would be suicidal." Father did not appear at the permanency hearing and is not a party to this appeal.

risk of suicide." Dudley reported that, rather than a hospital or foster family setting, J needed "a more structured therapeutic setting where there is higher supervision and a program of therapeutic services for [J]" and opined that J would "likely benefit from ongoing psychiatric consultation, individual counseling, and in the residential setting, group counseling."

At that time, J was receiving individual mental health therapy from Cudmore, a therapist at Wallowa Valley Center for Wellness in Enterprise. Cudmore recommended that J work on their coping skills and emotional regulation before any contact with their parents because of the "extreme triggering" such contact caused. In late May, Cudmore recommended limited phone contact with mother.

In June 2020, J was moved to therapeutic foster care near Roseburg in Douglas County, about an eight-hour drive from Wallowa County where mother lives. J reportedly transitioned well to this foster home, and they reported being happy there. After about six weeks, however, J began self-harming, including five or six incidents of them cutting themself on their arms and legs. J received minor first aid and was seen by a doctor, as needed, for those incidents. Murray, J's therapeutic foster mother, who had specialized training through Greater Oregon Behavioral Health Incorporated (GOBHI), testified that some of J's self-harm incidents happened in close proximity to the family therapy sessions (discussed below) or other contact with mother. They were also sometimes correlated with bullying at school or other things. According to Murray, J expressed that they love mother and want to have a relationship with her but not to live with her.

J was assigned an individual therapist in Douglas County but, after a few sessions, they requested a different one. In late June or early July, J began weekly one-on-one therapy sessions with Brent, a mental health therapist whose location was at the middle school J attended. Those 45-minute sessions continued until J left the foster care placement in February 2021. Brent testified that interaction with mother was a huge trigger for J's emotions and

trauma. Another trigger for J was trauma related to past sexual abuse allegations against their step-grandfather.[7] Brent reported that J was looking for "more acceptance of [their] transgender situation" and the situation with their step-grandfather. According to Brent, J made a lot of progress in therapy "until the situation with their mom coming back into the picture."

J also received WRAP services,[8] beginning in Wallowa County and transitioning to Douglas County when they moved there, and skills training through GOBHI while in foster care in Douglas County. In addition, J received medical services for a heart condition and other physical health conditions.

Meanwhile, mother voluntarily began individual mental health therapy with Lembke in June 2020. Those sessions were held weekly, with the exception of a couple of months when mother was engaged in family therapy (discussed below). According to Lembke, mother was working on emotional regulation and gaining acceptance of the fact of J's removal as well as accepting J for who they are. Lembke recommended "a skilled family therapist to deal with the complexity of this family," hopefully within the county, so that visits could be in person, if appropriate.

Mother also had the services of a parent coach, Farnam,[9] beginning in October 2020. At the outset, Farnam recommended therapeutically supervised parent-child visitation and family therapy for mother and J. She also recommended residential treatment for J, closer to Wallowa. In addition, mother was engaged with DHS, attending progress meetings and meeting with Fisher, J's permanency case worker.

___

[7] According to DHS, those allegations were not substantiated, resulting in no follow-up action.

[8] Although not fully set out in the record, we understand WRAP to be a collaborative planning process involving J, their mental health providers, DHS, foster parents, mother, and mother's service providers. In December 2020, J requested a new WRAP coordinator, because they did not feel comfortable with the one assigned.

[9] Farnam is a licensed clinical social worker who was engaged to provide parent education and support services to mother.

In fall 2020, J requested to legally change their name and also to receive hormonal therapy. DHS is supporting J in those requests. Fisher discussed with J that they needed to consult with their attorney about the legal ramifications of the name change. Fisher also explained to J that the Oregon Health Plan does not cover hormone therapy until a child is 15 years old and recommends that the child have access to a therapist knowledgeable in gender dysphoria. J was placed on a wait list for that type of therapy; they were still on that wait list at the commencement of the permanency hearing. According to both Fisher and Farnam, mother expressed support for J's self-exploration in terms of their gender identity, and the use of J's chosen name and pronouns, but felt that more permanent changes should not be made until J is older.

As will be significant to our analysis later, in late October 2020, after a review hearing, the juvenile court ordered that, "[p]ursuant to the case plan, in-person therapeutic visits between mother and child will begin as soon as possible, with DHS coordinating transportation with the child in Douglas County and mother in Wallowa County." DHS was unable to find therapeutic visitation services at that time, and Brent indicated to Fisher that she would be unable to provide that. After extended discussions between Fisher, Brent, mother, and Farnam, Brent agreed to facilitate weekly family therapy, with Farnam present to support mother. Mother and J participated in four or five of such sessions, beginning November 20, 2020, and continuing through December. All but one of the sessions were held remotely.

According to Brent, the sessions were "[t]ense" and "[u]nproductive." Sometimes J would shut down; other times the meeting would get heated. She testified that mother was "[d]ismissive" regarding J's gender identity and did not make an effort to use J's chosen name rather than J's legal name. J's foster mother, Murray, was also present for some of the sessions. Murray echoed Brent's recollection about the heatedness of the sessions and testified that she did not feel that they were beneficial to J. Farnam described the sessions as seemingly being run by J and not supportive of

mother. Fisher noted that it was difficult for the therapists to navigate their respective roles during the sessions.

As noted, only one of the family therapy sessions was held in person, on December 18. At that point, J and mother had not seen each other in close to a year. J appeared happy to see mother and "there appeared to be a closeness." However, according to Brent, there did not appear to be a willingness to discuss anything pertaining to reunification.

In mid-November, after J earned a cell phone by working with their therapeutic foster parents, J's phone contact with mother increased from approximately once a week to almost daily; that contact included calls, text messages, and social media. J began to be overwhelmed with the number of messages from mother and in December expressed the wish to have less contact with her.

In a December report and letter to DHS, Farnam noted her recommendation "that they begin participation in family therapy by a skilled family therapist who is familiar with their history and is impartial and/or uninvolved in a dual relationship with either of them." At the permanency hearing, Farnam testified that the lack of regular contact—ideally in-person contact—between mother and J was the primary hinderance in the case.

On January 29, 2021, Brent informed the parties that she would no longer facilitate the family therapy sessions and recommended that DHS engage a family therapist who was not a therapist for J or mother. Brent explained that she was not predominately a family therapist, that she did not feel that it was a good fit for her, and that she needed to focus on just being J's therapist. Brent continued as J's individual therapist until J left the Douglas County placement. At that time, she recommended no contact with mother, but she clarified that she had never recommended against in-person family therapy facilitated by an independent therapist. She also believed that J would benefit from more intensive therapeutic services and recommended individual therapy two to three times per week.

The permanency hearing took place over three days—January 27, March 24, and April 28, 2021. At the

time of the first hearing date, J was still living in the Douglas County therapeutic foster home, where they had been for about eight months. At the end of February, however, they were moved from that foster home and placed at Robinswood,[10] a residential group home in the Portland area for youth in DHS care.[11] J's concerning behaviors escalated while at Robinswood, both in terms of "verbal aggression" toward staff and other youth and self-harming. One cutting incident required medical attention and five or six stitches, another required approximately 40 stitches. J had weekly mental health support while at Robinswood; they were also waiting to be assigned an outpatient individual mental health therapist.

Absent a court order, in-person visitation was generally not allowed at Robinswood due to COVID-19 restrictions. Fisher arranged for weekly phone contact between J and mother, but J refused to take the second call, and, after that, the calls were ended at Dudley's recommendation (see below). Mother continued to write letters to J and to send care packages. J sometimes said they wanted contact with mother, other times they said they did not. J has also expressed a desire to be adopted.

Dudley evaluated J for the second time in March 2021, and his report was admitted into evidence at the April 28 permanency hearing date. Dudley noted that mother had made progress, but J was adamant about not returning home, and that the "quality of contact and relationship between [mother] and [J] ha[d] deteriorated over the last year." According to Dudley, J "believe[s] their mother to be domineering, uncaring, insensitive to their gender identity, and does not believe their mother is capable of a level of behavior change to where [J] would feel safe, supported, and nurtured." Dudley did not recommend return to parent, concerned that J would engage in behaviors such that they would not be safe in mother's home, or that escalating

_____

[10] That move was due to the foster parent no longer being able to provide a placement, rather than anything to do with J. J was initially moved to a different GOBHI therapeutic foster home, but that did not work out, and they were moved to Robinswood after just a week or so.

[11] Robinswood is a 60-day stabilization program; J was scheduled to be discharged from that program on May 5.

conflict would require law enforcement or DHS intervention, resulting in the need for a higher level of service and care for J. Dudley did, however, support ongoing efforts to facilitate a plan of return to parent, noting his belief that "there has [not] been sufficient or consistent efforts to reestablish and improve the parent-child relationship."

Although recognizing the system disruption caused by COVID-19, Dudley also opined that much of the under-lying cause of the chaos surrounding J could be attributed to J themself. According to Dudley, J seemingly "is engaged in effective splitting of the various supports and providers," noting that "[t]here have been changes in therapists, in WRAP coordinators, of levels of contact with their mother, of placements (albeit one was for medical issues), or of threat-ened or actual self-harm activity, with an end result that there has been no real consistency or stability for [J] for over a year." He recommended some form of residential treat-ment for J, ideally as close as possible to Wallowa County to allow for in-person visitation with mother; individual ther-apeutic services with routine psychiatric consultation; and regular family therapy, to include in-person visitation as soon as allowed, facilitated by a therapist who was not J's or mother's therapist. Finally, he recommended that, at least initially, family therapy be the only form of contact between J and mother; other forms of contact, such as phone calls, texting, and social media, could be added with clinical guid-ance as the relationship improves.

At the April 28 hearing, Fisher reported that there were no residential treatment facilities near Wallowa County, but that J had been accepted for residential treat-ment at River Rock, a facility in Douglas County, after dis-charge from Robinswood on May 4. Fisher also reported that a referral for family therapy had been made on February 4 and a family therapist had been assigned and intake com-pleted. The plan was for J to be transported to La Grande for the family therapy sessions so that they could be in per-son. However, the logistics of that had not yet been worked out. Accordingly, at the conclusion of the hearing, it was uncertain how frequently those sessions would occur, and there was no date set for when those sessions would begin.

At the permanency hearing, DHS and mother were in agreement that J could not be returned home at that time and that the permanency plan for J should remain return to parent.[12] Fisher testified that mother has done everything that DHS requested of her, but "[J's] behaviors are not stable enough to have a return plan at this time." And, mother needs "additional time to better understand from [J's] treatment providers * * * what is best in moving forward and how to support and provide the treatment and care that [J] needs." Moreover, according to Fisher, J has said that they do not want to go home and that they will harm themself if they do go home. Thus, the only dispute at the hearing (other than DHS's request for a psychological examination of mother, discussed above) was whether DHS had made reasonable efforts toward reunification.[13] *See* ORS 419B.476(2)(a) (requiring reasonable efforts finding in these circumstances).[14]

The juvenile court ultimately entered a permanency judgment continuing reunification as the permanency plan for J and determining that DHS had made reasonable efforts toward reunifying the family. Rather than detailing the court's findings in support of that determination, the permanency judgment provided, "Supplemental Judgment to follow, regarding further findings that are under advisement." Several months later, the court entered those supplemental findings (the "Supplemental Findings Re Reasonable Efforts" order that mother challenges in this appeal).

The court found that DHS has "provided extensive services to [J], including in-school educational support, individual therapy, medical and therapeutic interventions specifically related to their 'gender dysphoria,' family counseling, and placements in higher level of care residential facilities," as well as medication management addressing J's

_____

[12] J's attorney expressed J's desire that the permanency plan change to adoption, but J does not appeal the permanency judgment continuing the plan of reunification.

[13] In advance of the hearing, mother filed a memorandum request for a no reasonable efforts finding, to which DHS filed a response.

[14] The version of ORS 419B.476(2)(a) in effect at the time of the relevant events in this case has since been amended; however, because those amendments do not affect our analysis, we cite to the current version of the statute.

mental health needs. The court also found that mother was provided services consistent with the plan of reunification.

However, the court found that, despite those services,

> "[J] continues to refuse reintegration in a family with their mother, refuses contact with mother, and * * * perhaps most significantly has a history of self-injurious and suicidal behavior and ideations when confronted with potential visits with their mother and the possibility of reunification with mother. The rejection of contact with mother (outside of family therapy sessions) by [J] and the self-injurious behaviors have persisted despite months of therapy and other interventions."

In all, the court concluded that "[s]ervices to both mother and child have been therapeutically appropriate, provided in a timely manner consistent with the plan of care, and provided in therapeutically recommended locations for both mother and child."

C. *Analysis*

At a permanency hearing where the plan for the child is reunification, the court must determine, among other things, whether DHS "has made reasonable efforts * * * to make it possible for the ward to safely return home." ORS 419B.476(2)(a). "'Reasonable efforts' for purposes of ORS 419B.476(2)(a) are efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. W. M.*, 310 Or App 594, 598, 485 P3d 316 (2021) (some internal quotation marks omitted). It is DHS's burden to prove, by a preponderance of the evidence, that its efforts in that regard were reasonable. *Dept. of Human Services v. D. M. R.*, 301 Or App 436, 443, 455 P3d 599 (2019).

DHS's efforts "must go on long enough to allow for a meaningful assessment of whether parents are making sufficient progress to permit reunification." *W. M.*, 310 Or App at 598-99. Ultimately, whether DHS's efforts afforded a parent the requisite reasonable opportunity to address

the jurisdictional bases depends on the particular circumstances of the case. *Id.* at 599. Moreover, "[w]hen DHS has failed to offer or provide a particular service to a parent, we view the adequacy of DHS's efforts in light of the potential benefits that providing that service could have yielded." *Dept. of Human Services v. L. M. K.*, 319 Or App 245, 252, 510 P3d 278 (2022) (internal quotation marks omitted).

Mother argues that DHS's efforts here did not afford her an opportunity to make it possible for J to return to her care—and thus fell short of the legal standard—because DHS failed to provide adequate services to meet J's mental health needs and to make it possible for J and mother to successfully engage in the family counseling that was needed to repair the relationship. DHS responds that the record supports the court's factual findings that extensive services were provided to aid in reunification, including individual therapy for mother and J, several family therapy sessions, residential treatment for J, as recommended by Dudley and Farnam, and WRAP services, and that those services were "'therapeutically appropriate'" and "'provided in a timely manner.'" (Quoting juvenile court's findings.) Thus, DHS contends, the court did not err in determining that DHS's efforts were reasonable.

We first note that DHS fails to directly engage with mother's legal argument. Mother is not contending— nor do we find—that the juvenile court's factual findings with respect to the services offered to mother and J are not supported by the record. Rather, the question presented by mother's appeal is whether those efforts by DHS— undeniably supported by the record—were reasonable for purposes of ORS 419B.476(2)(a), which is a legal question. *V. A. R.*, 301 Or App at 567. In other words, did the services provided by DHS—even if extensive and otherwise therapeutically appropriate and timely—afford mother a reasonable opportunity to demonstrate that she was capable of becoming a minimally adequate parent? We conclude that they did not.

No one appears to dispute that, from the outset of this case, the primary impediment to reunification of mother

and J was the estranged relationship between mother and J, and J's continued opposition to returning home and insistence that they would harm themself if forced to do so. Most, if not all, of the professional service providers working with this family recognized that therapeutic visitation and/or family therapy with a neutral provider, preferably in person, was necessary for reunification to be possible. Mother's therapist, Lembke, recommended "a skilled family therapist to deal with the complexity of this family," in person if possible. Farnam, mother's parent coach, from the beginning suggested therapeutically supervised parent-child visitation and family therapy for mother and J. At one point, she specifically recommended family therapy by a skilled family therapist familiar with J's and mother's history and uninvolved in a "dual relationship with either of them." It was Farnam's opinion that the lack of regular contact between mother and J was the primary roadblock in the case. Brent, J's therapist, also noted the need for in-person family therapy facilitated by an independent therapist. And, significantly, the juvenile court in October 2020, ordered that "in-person therapeutic visits" between mother and J begin "as soon as possible." Further, the record reflects that J was willing to participate in family therapy, even when they otherwise did not want contact with mother.

Yet, at the time of the permanency hearing, more than 14 months after J entered substitute care, only five or six family therapy sessions had taken place, and those had been facilitated—not by a neutral therapist—but by J's individual therapist, whose expertise, by her own admission, was not family therapy. And, notably, only one of those sessions had been in person. Even at the conclusion of the permanency hearing, in April 2021, although a neutral family therapist had finally been assigned and the plan was to transport J to La Grande so that the sessions could be held in person, those sessions had yet to begin, nor was there a date set for when that would happen. Thus, almost six months after the court ordered in-person therapeutic visitation to begin "as soon as possible," it still had not occurred (with the exception of a single in-person visit) and DHS was uncertain when that would actually begin and how often it might occur.

Given that, by all accounts, in-person family therapy by a skilled, neutral therapist, or therapeutic visitation, was key to repairing the relationship between mother and J, and that, in turn, was key to the possibility of reunification, we conclude that DHS's efforts were not reasonable. Indeed, J's psychological evaluator, Dudley, found that "the quality of contact and relationship" between mother and J had actually deteriorated while J was in care, and there had not been "sufficient or consistent efforts to reestablish and improve" the relationship.

We recognize the challenge that the circumstances of this case present, and especially so, given that the events here were occurring in the midst of the COVID-19 pandemic, with its associated shutdowns and restrictions. Nonetheless, "institutional barriers" "do not categorically excuse DHS from meeting its obligation under ORS 419B.476(2)(a), an obligation that includes allowing enough time to give parents a reasonable opportunity to use those efforts to ameliorate the risk of harm to their child caused by the jurisdictional bases." *Dept. of Human Services v. M. W.*, 319 Or App 81, 84, 509 P3d 752 (2022) (internal quotation marks omitted).[15]

In a sense, this case is comparable to *W. M.* There, we held that, because the in-person training that was necessary to enable the mother to care for her child was essentially unavailable due to the pandemic, "DHS's efforts must extend long enough to allow for parents to obtain the type of training the pandemic has prevented them from having, and long enough to allow for meaningful assessment of whether that training will permit them to be minimally adequate parents." 310 Or App at 599; *see also J. D. R.*, 312 Or App at 518 ("DHS's efforts are not reasonable when they are not sufficiently aimed at alleviating the specific controlling jurisdictional basis."); *K. G. T.*, 306 Or App at 382 (court erred in determining that DHS efforts were reasonable where services that were not provided were "critical to the case plan,

---

[15] DHS does not contend that this was a situation in which it was impossible to provide in-person family therapy or therapeutic visitation with J and mother. *See K. G. T.*, 306 Or App at 381 ("[I]f it is truly not possible to provide a particular service to a particular parent, the 'cost' necessarily outweighs the benefit, no matter how great the benefit might be." (Footnote omitted.)).

and go directly to ameliorating the jurisdictional basis"); *V. A. R.*, 301 Or App at 570-71 (where DHS delayed providing the recommended type of training, so that mother had only five sessions by the time of the permanency hearing, mother was not given a reasonable opportunity to demonstrate that, with those services, she could become a minimally adequate parent).

This case also stands in stark contrast to *Dept. of Human Services v. M. K.*, 285 Or App 448, 396 P3d 294, *rev den*, 361 Or 885 (2017). In that case, we rejected the mother's argument that DHS's efforts were not reasonable because DHS had failed to provide therapeutic visitation. However, in that case, the children adamantly refused to participate and there was evidence in the record that further efforts to pursue such visitation "would have been unproductive or even harmful." *Id.* at 459. Here, by contrast J was willing to participate in family therapy. And all of the mental health providers, including J's therapist, agreed that such services would be helpful—even necessary—to facilitate family reunification.

D. *Conclusion*

By DHS's own account, mother had done everything that was asked of her toward reunification. She was entitled to a reasonable opportunity to work toward repairing the relationship with J, such that J might be able to return home. The court erred in determining that DHS's efforts toward reunification were reasonable.

Motion to dismiss denied. "Supplemental Findings Re Reasonable Efforts" order reversed and remanded; order requiring mother to submit to psychological evaluation vacated and remanded; otherwise affirmed.