No. 282          May 1, 2024          389

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of W. (C.) K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*
W. (C.) K.,
*Respondent,*
*v.*
M. A. Z.,
*Appellant.*

Multnomah County Circuit Court
20JU02869; A180913

Jacqueline L. Alarcón, Judge.

Argued and submitted September 7, 2023.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Aron Perez-Selsky filed the brief for respondent W. (C.) K.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Father appeals from a judgment changing the permanency plan for his child, C, from reunification to guardianship. He challenges the juvenile court's determination that (1) the Department of Human Services (DHS) made reasonable efforts toward reunification and (2) that his progress toward reunification was insufficient. On appeal, father contends that DHS's efforts failed to focus on the jurisdictional basis of repairing his relationship with C, and that C's attorney, as the party seeking the change in plan, failed to meet the burden to prove that father's progress qualified as insufficient. We conclude that sufficient evidence supports the juvenile court's determination and, accordingly, affirm.

In the absence of *de novo* review, which neither party has requested, we are bound by the court's findings of fact if there is any evidence in the record to support those findings. *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014). We view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's determination and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. D. W. C.*, 258 Or App 163, 165, 308 P3d 316, *rev den*, 354 Or 490 (2013). In view of that standard, we set out a limited recitation of the underlying facts and procedural history.

## BACKGROUND

DHS removed C, who was 10 years old, and C's two younger siblings (who are not subject to this appeal) from mother's custody in May 2020. Mother, who is not a party to this appeal, had a history of suffering from paranoia, schizophrenia, and bipolar disorder. Under mother's care, the family moved frequently and experienced housing instability, often living in shelters and motels. Mother told C lies about father, including telling C that father had "violated" him when he was younger, and that father was looking for them and was going to kill them.

Father lives in Centralia, Washington with his wife and five boys. He first learned of C's existence in 2013, when

C was about three years old, and DHS contacted father to establish paternity for child support. Sometime in 2014, mother's family contacted father and asked him to care for C. C was in father's care for approximately one week before law enforcement removed C and returned him to mother. Father initiated a *pro se* custody proceeding but was never able to locate and serve mother.

Father was notified after DHS took protective custody of C in May 2020, and he indicated that he wanted to parent C. While considering placement, DHS initiated two psychological assessments for C, which suggested C had experienced a significant amount of trauma and neglect in his life. The assessments showed a "high probability" diagnosis of post-traumatic stress disorder or PTSD with dissociation, derealization, and "intense re-experiencing including auditory and possibly visual phenomena." The assessments also revealed "moderate probability" diagnoses for both autism spectrum disorder and attention deficit/hyperactivity disorder or ADHD, and a "monitor" status for Unspecified Schizophrenia Spectrum or other psychotic disorders. The assessments recommended therapy for C and that any changes in placement be handled carefully and slowly.

C was placed in nonrelative foster care, and the juvenile court ordered DHS to "make reasonable efforts to provide therapeutic visitation" with father. The basis for dependency jurisdiction was father's stipulation that he was "not able to be a custodial resource without DHS involvement to repair the relationship with the child." DHS facilitated visits immediately, including two in May 2020, and the visits continued although they were infrequent due to COVID, father's work schedule, and the geographic distance. DHS provided funding to help with travel costs, arranged for father to attend parenting classes, and implemented an Interstate Compact on Placement of Children (ICPC) study on father's home. Father identifies as Latino, and the agency hired a mentor to aid C in adjusting to father's home because, according to a DHS caseworker, C was experiencing "culture shock" having not been around a Latino family.

By September 2021, father was approved to host overnight visits, and DHS implemented monthly weekend visits between father and C. In October 2021, C started individual therapy with Durocher, the first therapy he was provided since DHS took custody in May 2020. C developed a trusting relationship with Durocher, and DHS asked her to engage in family therapy with father and C, jointly. Around the same time, DHS engaged Dr. Bennett to conduct another psychological evaluation of C. Bennett noted that C's struggle to decide whether he wanted to live with father was generating considerable stress. C expressed ideations of self-harm during the evaluation, and Bennett stressed that it was important that C not carry the weight of deciding where his permanent placement would be. She emphasized that C needed to be parented by "a skilled caregiver who has some insights about the impact of his traumatic experiences on his emotional well-being, and who is capable of providing calm, consistent, and nurturing responses when he is exhibiting distress, sadness or frustration."

In February 2022, a number of events occurred that eventually led to DHS to end visits between father and C:

- At the second family therapy session, father arrived "escalated" due to a miscommunication about where to meet. In C's presence, father was "pretty upset and was raising his voice." C was supposed to go home with father for the weekend, but the caseworker eventually cancelled the visit and C left with his resource parent.

- At individual therapy, C told Durocher that father spanked his other child "pretty hard," and that "really bothered" C.

- At individual therapy, C told Durocher that he had decided that he did not want to live with father and said he wanted to share that with father during their family session. C told Durocher that father had expressed, from the beginning, that father would support C's decision on where he wanted to live. At the family session, Durocher raised the issue with father, saying "C is saying that this is what he wants." Father became upset, would not listen to C when he tried to express himself, and refused Durocher's request to leave the office to "cool off." Eventually, Durocher sent C out of the office,

the weekend visit with father was cancelled, and father was asked to leave. Durocher did not "feel very safe" about continuing family therapy with father, and DHS made the decision to end it.

• At individual therapy, C told Durocher that he considered running away or killing himself if he had to live with father and that he did not want to continue doing family therapy.

DHS canceled unsupervised visits, met with C to consider how to support him during visits with father, met with father to discuss how to continue visits, offered father anger management classes, and engaged a therapeutic skill builder to work with father on his relationship with C. Father attended one supervised visit with C and the skill builder but did not otherwise engage with her or respond to her efforts to contact him. Father began individual counseling with a mental health therapist to gain skills to better parent C.

At C's request, his attorney filed a motion to change the plan from permanency to guardianship. Following a hearing, the juvenile court referee issued a permanency order changing the plan to guardianship. Father requested a rehearing, which required appearances on six separate days and took over five months to complete. Conducting *de novo* review, the juvenile court determined that DHS had made reasonable efforts toward reunification and that father had not made sufficient progress for C to be safely returned to his care. Specifically, the court found C's threats of self-harm to be credible, that father minimized C's mental health needs, and that father had "not engaged in therapy in a way that he can develop a relationship with [C] that is safe and appropriate." The court issued a permanency judgment changing the plan from reunification to guardianship. Father timely appeals from that judgment.

## DISCUSSION

Changing a child's permanency plan from reunification to guardianship requires a determination by the juvenile court that the party seeking the change proved by a preponderance of the evidence that (1) DHS made reasonable efforts to make it possible for the child to safely reunify with

the parent, and (2) notwithstanding those efforts, the parent's progress was insufficient to allow reunification. ORS 419B.476(2)(a); *Dept. of Human Services v. V. A. R.*, 301 Or App 565, 567, 456 P3d 681 (2019). Here, C sought the change in plan and contends that the court correctly determined that DHS made reasonable efforts toward reunification and that father's progress was insufficient. DHS, for its part, contends that it made reasonable efforts but takes no position as to whether father made sufficient progress or whether the juvenile court correctly changed the plan to guardianship. In challenging the court's determination, father argues that DHS's significant delay in implementing therapy was unreasonable in light of the jurisdictional basis and that his efforts to engage with his own therapist to understand C's trauma showed sufficient progress toward reunification.

*Reasonable efforts.* For purposes of ORS 419B.476 (2)(a), reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. W. M.*, 310 Or App 594, 598, 485 P3d 316 (2021) (internal quotation marks omitted). DHS's efforts to assist the parent are considered under the totality of the particular circumstances of the case, with the paramount concern being the child's health and safety. *Dept. of Human Services v. M. K.*, 285 Or App 448, 456, 396 P3d 294, *rev den*, 361 Or 885 (2017). In considering the totality of the circumstances of this case, we conclude that, although DHS significantly delayed implementation of therapy for C, DHS's efforts toward reunification were reasonable.

DHS's efforts to reunify C with father included a focus on stabilizing C in appropriate foster care, arranging parenting classes for father, conducting an ICPC assessment to ensure the safety of father's home in Washington, and facilitating visits between father and C. DHS also contracted with a mentor specialist to work with C and help him become more comfortable with father's self-identified cultural background. Those efforts focused on the jurisdictional basis of repairing father's relationship with C and were consistent with C's psychological assessments that

recommended that any changes in his placement be handled carefully and slowly.

Regarding therapy, although it was delayed, DHS did implement therapy for C and father 10 months before the permanency hearing. Following father's angry outbursts, DHS reached out to all parties to discuss how to support father's relationship with C and initiated a meeting with father and Durocher to discuss C's psychological wellbeing and needs. When C started threatening self-harm and visitation was paused, DHS met with C to discuss "what would help [C] feel supported when visiting with father" and also convened a meeting with a permanency consultant to discuss how they could "move this case forward for visits to continue." DHS also provided father with a therapeutic skill builder and offered father anger management classes.

Accordingly, despite the delay in providing therapy, the record shows that in the year leading up to the permanency hearing, DHS did implement therapy for both C and father. *See Dept. of Human Services v. S. S.*, 278 Or App 725, 735, 375 P3d 556 (2016) (explaining that we evaluate DHS's efforts over the life of the case "with an emphasis on a period before the hearing sufficient in length to afford a good opportunity to assess parental progress" (internal quotation marks and citations omitted)). When viewed in context with DHS's other efforts toward reunification, the record sufficiently supports the juvenile court's determination that DHS made reasonable efforts to provide father with services that would facilitate reunification.

*Sufficiency of father's progress.* In summarizing the legal standard a juvenile court utilizes to assess "sufficient progress," the Oregon Supreme Court recently explained that the court determines "whether the parent has ameliorated the conditions or circumstances that led the juvenile court to make the child a ward of the court to the extent necessary to make possible—with continued services from DHS if necessary—the child's safe return to the parent's care." *Dept. of Human Services v. Y. B.*, 372 Or 133, 151-52, ___ P3d ___ (2024). The determination of whether a parent has made sufficient progress toward reunification is considered in the context of the factual basis for jurisdiction.

*D. W. C.*, 258 Or App at 171. In making that determination, the court gives the highest priority to the child's health and welfare. *Dept. of Human Services v. L. M. K.*, 319 Or App 245, 253, 510 P3d 278 (2022). Father contends that he made sufficient progress toward reunification because he met all of the expectations set by the juvenile court and had demonstrated progress toward understanding how to parent C with a therapist that he engaged on his own initiative.

The juvenile court determined that, although father had made progress in his relationship with C, C could not be safely returned to his care. In particular, the court found that father had not engaged in therapy in a safe or appropriate way and that father minimized C's mental health needs, including C's threats of self-harm. Given the evidence regarding C's specific needs, the record sufficiently supports the court's determination that father had not made sufficient progress toward reunification.

In particular, the record surrounding the nature of C's trauma and diagnoses established that parenting C requires emotional stability in a calm environment that focuses on C's specific needs. Those needs include being parented by an "emotionally stable adult" who is "capable of providing calm, consistent, and nurturing responses when he is exhibiting distress, sadness or frustration." Father's behavior, particularly his angry outbursts during family therapy, were inconsistent with C's specific needs and failed to ameliorate the conditions and circumstances that led to the court's assertion of jurisdiction over C. Thus, despite father's progress and efforts to meet the court's requirements, sufficient evidence in the record supports the court's determination. *See G. N.*, 263 Or App at 297 (explaining that "[e]ven if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home"). Consequently, the juvenile court did not err in its determination that father's progress was not sufficient for C to safely return to his care. Accordingly, we affirm the judgment of the juvenile court exercising jurisdiction over C.

Affirmed.